No. 23-1991

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

AMAZON.COM, INC.; AMAZON DATA SERVICES, INC.,

*Plaintiffs-Appellants*,

v.

WDC HOLDINGS LLC, d/b/a Northstar Commercial Partners; BRIAN WATSON; STERLING NCP FF, LLC; MANASSAS NCP FF, LLC; NSIPI ADMINISTRATIVE MANAGER; CARLETON NELSON; CASEY KIRSCHNER; CHESHIRE VENTURES LLC; RODNEY ATHERTON,

*Defendants-Appellees*,

and

RENRETS LLC; NOVA WPC LLC; WHITE PEAKS CAPITAL LLC; VILLANOVA TRUST; ALLCORE DEVELOPMENT LLC; FINBRIT HOLDINGS LLC; 2010 IRREVOCABLE TRUST; SIGMA REGENERATIVE SOLUTIONS LLC; CTBSRM, INC.; DEMETRIUS VON LACEY,

*Defendants*.

On Appeal from the United States District Court
for the Eastern District Of Virginia, No. 1:20-cv-484-RA

## BRIEF OF APPELLEES

Kian J. Hudson
BARNES & THORNBURG LLP
11 S Meridian St.
Indianapolis, IN 46204
(317) 229-3111
*Counsel for Casey Kirschner*

Stanley L. Garnett
GARNETT POWELL MAXIMON BARLOW
900 Arapahoe Ave.
Boulder, CO 80302
(303) 991-3344
*Counsel for Brian Watson, WDC Holdings LLC, Sterling NCP FF, LLC, Manassas NCP FF, LLC, and NSIPI Administrative Manager*

Adam Smart
BURR & FORMAN, LLP
50 North Laura St., Suite 3000
Jacksonville, FL 32801
(904) 232-7200
*Counsel for Carleton Nelson and Cheshire Ventures LLC*

Julie S. Palmer
HARMAN, CLAYTOR, CORRIGAN & WELLMAN
P.O. Box 70280
Richmond, VA 23255
(804) 747-5200
*Counsel for Rodney Atherton*

*Additional Counsel in Signature Block*

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and Fourth Circuit Local Rule 26.1, Defendants-Appellees make the following corporate disclosure statement. Brian Watson, Carleton Nelson, Casey Kirschner, and Rodney Atherton all state that they are natural persons. WDC Holdings LLC, d/b/a Northstar Commercial Partners; Sterling NCP FF, LLC; Manassas NCP FF, LLC; NSIPI Administrative Manager; and Cheshire Ventures LLC all state that they are not trade associations, are not publicly held entities, do not have any parent corporations, and no publicly traded entity owns 10% or more of their stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF CONTENTS........................................................................ ii

TABLE OF AUTHORITIES .................................................................. iii

INTRODUCTION ...............................................................................1

JURISDICTIONAL STATEMENT ...........................................................3

ISSUES ON APPEAL .........................................................................3

STATEMENT OF THE CASE.................................................................4

I.    The Defendants ........................................................................4

II.   The Lease Transactions................................................................7

III.  The Direct Purchase Transactions....................................................9

IV.  The Summary Judgment Decision ...................................................12

STANDARD OF REVIEW ...................................................................13

SUMMARY OF THE ARGUMENT .........................................................13

ARGUMENT ..................................................................................14

I.    Amazon's Civil RICO Claims Fail for Two Separate Reasons......................14

    A. Amazon failed to provide evidence of actual damages.................................14

    B. Amazon failed to establish a RICO enterprise .............................................24

II.   Amazon's Fraud Claims Fail for Lack of Actual Damages.............................30

    A. Amazon did not address, much less refute, the fraud damages arguments...31

    B. No Virginia fraud cases support Amazon's no-damages-necessary theory..34

III.  Amazon's Unjust Enrichment and Conversion Claims Fail Because Virginia Law Precludes Such Claims Where, As Here, an Express Contract Covers the Same Subject Matter of the Parties' Dispute .............................................40

IV.  Amazon's Civil Conspiracy Claim Against Atherton Fails Because Virginia Law Prohibits Holding an Agent Liable for Conspiring with Its Principal.....51

CONCLUSION ...............................................................................54

STATEMENT REGARDING ORAL ARGUMENT ...........................................55

CERTIFICATE OF COMPLIANCE.........................................................56

# TABLE OF AUTHORITIES

## Cases

*AlAbood v. Elshamari,*
217 F.3d 225 (4th Cir. 2000) ...............................................................29

*Amazon.com, Inc. v. WDC Holdings LLC,*
2021 WL 3878403 (4th Cir. Aug. 31, 2021) ...............................48, 50

*Assicurazioni Generali, S.p.A. v. Neil,*
160 F.3d 997 (4th Cir. 1998) ...............................................................37

*Associated Banc-Corp v. John H. Harland Co.,*
2007 WL 128337 (E.D. Wis. Jan. 11, 2007) .........................43, 45, 47

*Augusta Mut. Ins. Co. v. Mason,*
645 S.E.2d 290 (2007) .........................................................................38

*Avalonbay Cmtys., Inc. v. Willden,*
2008 WL 2780983 (E.D. Va. July 16, 2008).....................................36, 37

*Azrielli v. Cohen Law Offices,*
21 F.3d 512 (2d Cir. 1994) ..................................................................24

*Beale v. Hardy,*
769 F.2d 213 (4th Cir. 1985) ...............................................................23

*Bowe v. Public Storage,*
106 F. Supp. 3d 1252 (S.D. Fla. 2015) ................................................19

*Bowen v. Adidas Am. Inc.,*
84 F.4th 166 (4th Cir. 2023) ................................................................16

*Boyle v. United States,*
556 U.S. 938 (2009)..............................................................................24

*Buschi v. Kirven,*
775 F.2d 1240 (4th Cir. 1985) .............................................................52

*Byrd v. Crosstate Mortg. & Investments, Inc.,*
34 Va. Cir. 17 (1994) ......................................................................35, 37

Cases [cont'd]

*Carter v. Fleming*,
879 F.3d 132 (4th Cir. 2018) ...................................................14

*Cedar Swamp Holdings, Inc. v. Zaman*,
487 F. Supp. 2d 444 (S.D.N.Y. 2007) .................................26

*Celeste v. Bayliss*,
1986 WL 401809 (Va. Cir. Ct. July 23, 1986) ...................33

*Cmty. Bank v. Wright*,
267 S.E.2d 158 (Va. 1980) ...................................................40

*Companion Prop. & Cas. Ins. Co. v. U.S. Bank Nat'l Ass'n*,
2016 WL 3452734 (D.S.C. June 24, 2016) .........................22

*Condo. Servs., Inc. v. First Owners' Ass'n of Forty Six Hundred Condo., Inc.*,
709 S.E.2d 163 (Va. 2011) ...................................................49

*Devine v. Buki*,
767 S.E.2d 459 (Va. 2015) ...................................................35

*Dickerson v. TLC The Laser Eye Ctr. Inst., Inc.*,
493 F. App'x 390 (4th Cir. 2012) ...................................15, 16

*Donaldson v. Primary Residential Mortg., Inc.*,
2020 WL 3184089 (D. Md. June 12, 2020)........................26, 27

*Flip Mortg. Corp. v. McElhone*,
841 F.2d 531 (4th Cir. 1988) ...............................................15

*Fox v. Deese*,
362 S.E.2d 699 (Va. 1987) ...............................................51, 52

*Gallop v. Sharp*,
19 S.E.2d 84 (Va. 1942) .......................................................54

*GE Inv. Priv. Placement Partners II v. Parker*,
247 F.3d 543 (4th Cir. 2001) ...............................................15

iv

# Cases [cont'd]

*Gen. Assur. of Am., Inc. v. Overby-Seawell Co.*,
533 F. App'x 200 (4th Cir. 2013) ......................................................... 38

*Gilbert v. United States Bureau of Alcohol, Tobacco, Firearms & Explosives*,
805 F. App'x 198 (4th Cir. 2020) ......................................................... 28

*Gilmore v. Berg*,
820 F. Supp. 179 (D.N.J. 1993) ........................................................... 25

*Gomez v. Wells Fargo Bank, N.A.*,
676 F.3d 655 (8th Cir. 2012) ............................................................... 16

*Goodweather v. Parekh*,
2021 WL 4149030 (E.D. Va. Sept. 10, 2021) ..................................... 24

*Graves v. Lioi*,
930 F.3d 307 (4th Cir. 2019) ............................................................... 47

*Guldseth v. Fam. Med. Assocs. LLC*,
45 F.4th 526 (1st Cir. 2022) ................................................................ 41

*Henderson v. Truist Bank*,
2022 WL 17417167 (E.D. Va. Dec. 5, 2022) ...................................... 33

*Hengle v. Treppa*,
19 F.4th 324 (4th Cir. 2021) ............................................................... 17

*Holland v. Big River Minerals Corp.*,
181 F.3d 597 (4th Cir. 1999) ............................................................... 52

*Huntingdon Life Sciences, Inc. v. Rokke*,
986 F. Supp. 982 (E.D. Va. 1997) ....................................................... 53

*Impress Cmmc'ns v. Unumprovident Corp.*,
335 F. Supp. 2d 1053 (C.D. Cal. 2003) ............................................... 20

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010) ................................................................ 26

Cases [cont'd]

*Ivar v. Elk River Partners, LLC*,
   705 F. Supp. 2d 1220 (D. Colo. 2010)...............................................20

*James G. Davis Constr. Corp. v. FTJ, Inc.*,
   841 S.E.2d 642 (Va. 2020) ...........................................41, 42, 44, 46

*Kewaunee Scientific Corp. v. Pegram*,
   503 S.E.2d 417 (N.C. App. 1998)......................................................37

*Kinetic Concepts, Inc. v. Convatec Inc.*,
   2010 WL 1667285 (M.D.N.C. Apr. 23, 2010) ..................................31

*Klaiber v. Freemason Assocs., Inc.*,
   587 S.E.2d 555 (Va. 2003) ...............................................................32

*Liberty Mut. Ins. Co. v. Triangle Indus.*,
   957 F.2d 1153 (4th Cir. 1992) .........................................................37

*LMP Holdings, LLC v. PLY Enterprises, LLC*,
   2012 WL 4344302 (E.D. Va. Sept. 21, 2012) ..................................51

*Lynnwood Tech Holdings LLC v. NR Int. LLC.*,
   2017 WL 1238033 (Va. Cir. Ct. Feb. 24, 2017).........................35, 36

*Maio v. Aetna, Inc.*,
   221 F.3d 472 (3d Cir. 2000) ......................................................16, 20

*Marlboro v. Scannapieco*,
   545 F. Supp. 2d 452 (D.N.J. 2008)...................................................16

*Martz v. Day Dev. Co., L.C.*,
   35 F. 4th 220 (4th Cir. 2022) ...........................................................20

*McClung v. Smith*,
   870 F. Supp. 1384 (E.D. Va. 1994) .................................................39

*McLaughlin v. Am. Tobacco Co.*,
   522 F.3d 215 (2d Cir. 2008) .............................................................16

*Med-Therapy Rehab. Servs., Inc. v. Diversicare Corp. of Am.*,
   16 F.3d 410, 1994 WL 34745 (4th Cir. 1994)..................................35

Cases [cont'd]

*Menuskin v. Williams*,
   940 F. Supp. 1199 (E.D. Tenn. 1996)..........................................................24, 25

*Michigan Mut. Ins. Co. v. Smoot*,
   129 F. Supp. 2d 912 (E.D. Va. 2000) ...................................................................52

*Millboro Lumber Co. v. Augusta Wood Prods. Corp.*,
   125 S.E. 306 (Va. 1924) ...............................................................................34, 35

*Miller v. Asensio & Co.*,
   364 F.3d 223 (4th Cir. 2004) ...............................................................................21

*In re Morris Commc'ns NC, Inc.*,
   914 F. 2d 458 (4th Cir. 1990) ...............................................................................20

*Nahigian v. Juno-Loudon, LLC*,
   2010 WL 3418179 (E.D. Va. Aug. 23, 2010) ......................................................33

*Nelson-Salabes, Inc. v. Morningside Dev., LLC*,
   284 F.3d 505 (4th Cir. 2002) ...............................................................................22

*Nunes v. Fusion GPS*,
   531 F. Supp. 3d 993 (E.D. Va. 2021) ...................................................................28

*Perk v. Vector Res. Group*,
   485 S.E.2d 140 (Va. 1997) ...................................................................................51

*Persaud Companies, Inc. v. IBCS Grp., Inc.*,
   425 F. App'x 223 (4th Cir. 2011)...................................................................30, 31

*Raymond, Colesar, Glaspy & Huss, P.C. v. Allied Cap. Corp.*,
   961 F.2d 489 (4th Cir. 1992) .........................................................................41, 46

*Rivard v. Trip Mate, Inc.*,
   No. 22-1554, 2023 WL 2624721 (3d Cir. Mar. 24, 2023) ............................41, 43

*Ruffin v. Bank of New York Mellon*,
   2013 WL 12140483 (E.D. Va. May 21, 2013)......................................................35

*Saleh v. Va. State Univ.*,
   1999 WL 34798179 (E.D. Va. Feb. 25, 1999) ......................................................53

**Cases [cont'd]**

*Sharma v. USA Int'l, LLC,*
    851 F.3d 308 (4th Cir. 2017) ......................................................32, 33

*Smith v. Purnell,*
    2011 WL 6140868 (E.D. Va. Dec. 9, 2011).........................................52

*SodexoMAGIC, LLC v. Drexel Univ.,*
    24 F.4th 183 (3d Cir. 2022) .................................................................41

*Southern Biscuit Co. v. Lloyd,*
    6 S.E.2d 601 (Va. 1940) ......................................................................41

*Sowell v. Butcher Singer, Inc.,*
    926 F.2d 289 (3d Cir. 1991) ........................................................19, 20

*Steele v. Hosp. Corp. of Am.,*
    36 F.3d 69 (9th Cir. 1994) ...................................................................16

*Straley v. Fisher,*
    10 S.E.2d 551 (Va. 1940) ....................................................................49

*U.S. Airline Pilots Ass'n v. Awappa, LLC,*
    615 F.3d 312 (4th Cir. 2010) ........................................................15, 24

*United States v. Idlewild Pharmacy, Inc.,*
    308 F. Supp. 19 (E.D. Va. 1969) .........................................................35

*United States v. Pinson,*
    860 F.3d 152 (4th Cir. 2017) ........................................................24, 29

*United States v. Werner,*
    36 F.3d 1095, 1994 WL 507461 (4th Cir. 1994).................................20

*Utility Audit, Inc. v. Horace Mann Service Corp.,*
    383 F.3d 683 (7th Cir. 2004) ...............................................................43

*Vertex Telecom, Inc. v. XO Commc'ns, Inc.,*
    2006 WL 3746142 (E.D. Va. Dec. 14, 2006).....................................35

**Cases [cont'd]**

*Vuyyuru v. Jadhav*,
2011 WL 1483725 (E.D. Va. Apr. 19, 2011) ...............................27, 29

*West Virginia v. Moore*,
895 F. Supp. 864 (S.D.W. Va. 1995)......................................16, 17, 18

*Wilderness Med. Ass'n, Inc. v. Nat'l Ass'n for Search & Rescue*,
1994 WL 1031397 (Va. Cir. Ct. Oct. 25, 1994) ...............................50

*Young-Allen v. Bank of Am., N.A.*,
839 S.E.2d 897 (Va. 2020) ...............................................................51

*Zaklit v. Glob. Linguist Sols., LLC*,
53 F. Supp. 3d 835 (E.D. Va. 2014) ................................................36

**Statutes**

18 U.S.C. § 1964(c) ............................................................................15

Va. Code § 18.2-500(a)......................................................................54

**Other Authorities**

Restatement (Third) of Restitution and Unjust Enrichment § 2 (2011) ......41, 42, 43

18B Wright, Miller & Cooper, Fed. Prac. & Proc. § 4478.5 (3d ed.) ....................48

# INTRODUCTION

This case concerns real estate transactions executed by Amazon.com—among the most valuable and sophisticated companies in existence. Amazon claims that two of its employees (Carleton Nelson and Casey Kirschner) worked with an attorney (Rodney Atherton) and real estate developers (including Brian Watson) to convince Amazon to enter into these transactions—transactions that other Amazon employees evaluated and approved, that ultimately profited Amazon, and that Amazon has never sought to rescind. Although Amazon initially alleged that it overpaid millions of dollars in these transactions, it has since failed to produce any evidence of overpayment—or of any other harm.

Of what, then, does Amazon complain? The company's claims have shifted over the course of multiple complaints. Amazon's central allegations, however, are that Watson paid referral fees (which it denigrates as "kickbacks" even though such fees are ubiquitous in commercial real estate) to Nelson and Kirschner via entities created by Atherton. Amazon objects to these referral fees for one reason—that Nelson and Kirschner were Amazon employees.

Nelson's and Kirschner's obligations as Amazon employees, however, were expressly defined by contracts Amazon itself drafted. Indeed, Amazon brought breach-of-contract claims against Nelson and Kirschner, arguing that the contracts barred Nelson and Kirschner from accepting referral fees on Amazon-related real

estate transactions. And the district court—in a decision Amazon does not challenge on appeal—*rejected* those claims, holding that the contracts *did not prohibit* the conduct Amazon alleges here. JA3734–3741. Amazon also once raised breach-of-contract claims against Watson and related defendants premised on leases it had with these defendants; it no longer presses those claims either.

Further, Amazon recognizes that claims premised on "kickbacks" generally require showing that the defendants owed the plaintiffs "fiduciary duties to return any kickback"; it repeatedly cites fiduciary-duty cases and asserts Kirschner and Nelson "owed inherent fiduciary duties to Amazon." Br. 23 (quotation marks and citation omitted); *see also id.* at 32–35. Below, however, Amazon did not argue— much less prove—any defendant owed it any fiduciary duty. Nor has it ever raised a breach-of-fiduciary-duty claim. For good reason—any such claim would fail.

Having lost on its most directly applicable theories, Amazon tries to stretch inapposite legal theories to cover the alleged facts of this case. The district court properly rejected those efforts. As to Amazon's claim under the Racketeering Influenced and Corrupt Organizations Act (RICO), the district court identified two independently fatal defects: Amazon showed neither actual damages nor a RICO enterprise. Amazon similarly failed to satisfy the damages element of its Virginia-law fraud claim. And the district court rejected Amazon's unjust enrichment and conversion claims (which seek only equitable relief) because Virginia law does not

allow a plaintiff recourse to such claims where, as here, the plaintiff has valid contracts with the defendants that address the subject of the dispute. Finally, the district court held that Amazon's civil conspiracy claim against Atherton is foreclosed by Virginia law, which does not allow plaintiffs to sue agents for "conspiring" with their principals.

Each of these determinations is correct. The district court's decision should therefore be affirmed.

## JURISDICTIONAL STATEMENT

Amazon's jurisdictional statement is complete and correct.

## ISSUES ON APPEAL

1. Did the district court correctly grant Defendants summary judgment on Amazon's RICO claim?

2. Did the district court correctly grant Defendants summary judgment on Amazon's Virginia-law fraud claim?

3. Did the district court correctly grant Defendants summary judgment on Amazon's unjust enrichment and conversion claims?

4. Did the district court correctly grant Atherton summary judgment on Amazon's civil conspiracy claim?

## I.     The Defendants

Nelson and Kirschner worked for Amazon as real estate transaction managers. JA1161, JA3773, JA6300. In this capacity they participated in Amazon's extensive process for identifying and evaluating real estate to lease or purchase. JA3773. Amazon's process for built-to-suit lease or direct purchase transactions for data centers involved multiple steps and requires multiple Amazon employees to review and approve transactions and required the approval of multiple Amazon executives across numerous departments. JA296, JA913–914, JA3773, JA6051–JA6054. As transaction managers, Nelson and Kirschner were just one part of this process; they could not unilaterally approve any transaction. JA297, JA6050–6057; D.E. 1183-19 at 50–60. As a "condition of his employment," Nelson and Kirschner each entered Amazon-drafted "Confidentiality, Noncompetition and Invention Assignment Agreements" ("CNIAAs"). JA569, JA1451–1464.

Watson is the founder and chief executive officer of Northstar Commercial Partners, a real estate investment, development, and asset management company. JA279, JA113; D.E. 156-3. In the second half of 2017, Northstar responded to a request for proposal to develop a built-to-suit data center for Amazon, and Amazon selected Northstar. JA4603, JA6242, JA6719. Between February 2018 and January 2020, Amazon entered into contracts with entities affiliated with Northstar and a

joint venture partner (IPI Partners, Ltd.) to develop nine data centers which Amazon would then lease.[1] JA3775, JA3780, JA6242. Additionally, Amazon entered into two direct and unrelated purchase transactions—the "White Peaks" and "Blueridge" transactions—where Amazon bought land from unrelated sellers with plans to develop the data centers itself. JA3772, JA3799, JA3805. The Watson Defendants were not involved with the Direct Purchase Transactions. JA164, JA520–521, JA549–552.

Northstar used referral partners for introductions to potential commercial relationships. JA6151–6152, JA2121. Beginning in 2016, Northstar engaged Christian Kirschner as a referral partner; he was paid a flat monthly stipend for introductions. JA385, JA2119, JA6363–6364.[2] In this role, Christian introduced Northstar to Kirschner to discuss possible development opportunities between Northstar and Amazon. JA6157–6158. When that referral opened the door for Watson to begin his relationship with Amazon and led to a transaction with Amazon, Watson and Christian entered into a new referral agreement.[3] JA1714, JA2119–

[1] This brief refers to Northstar, Watson, and various entities used in connection with these transactions collectively as the "Watson Defendants."

[2] This brief refers to Christian Kirschner as "Christian" and to his brother Casey Kirschner as "Kirschner."

[3] IPI ███████████████████████████ in connection with the Lease Transactions. JA5028. Amazon has not challenged the propriety of that arrangement.

2120. At Christian's request, the new referral agreement was between Northstar and an entity (the Villanova Trust) set up by Christian's attorney, Atherton, and which Christian controlled. JA2119–2120, JA4582, JA4586. Under the Villanova Trust Agreement, Christian received referral fees from Northstar. JA1715. The referral fees were based on various standard fees included in the budgets for the lease transactions. JA0308, JA924–925, JA1077, JA5008, JA5745–5746. All referral fees paid to the Villanova Trust were paid by Northstar. JA281.

Approximately six months after Northstar submitted its first response to Amazon's request for proposals, Kirschner informed Nelson that Christian wished to form and invest in a real estate development company with Kirschner. JA781–784. At the time, Nelson understood that Christian wanted to use a portion of the referral fees that he would likely receive from Northstar to fund a portion of the proposed new venture. JA769–777.

Christian ultimately sought legal advice from Atherton concerning his desire to create a real estate development company for which his brother, Kirschner, could work at some point in the future, once he left employment with Amazon. JA4583, JA7678. Atherton is a Colorado-licensed attorney who operated the firm Ergo Law, LLC during all relevant times—from 2016 through 2021. D.E. 1173 ¶ 5. He created trusts and corporate entities on behalf of Kirschner, Christian, and Nelson. D.E. 1174 ¶ 7. Atherton recommended the creation of certain entities and controls for any

money that Christian might invest in the venture. JA4583, JA7678. Atherton researched the propriety and legality of the business structure and loans before advising his clients, and eventually created the entities at their direction. JA786–788, JA7681, JA1836–JA1840, JA4583–JA4584; D.E. 1173, Ex. E.

## II.    The Lease Transactions

In 2018, Amazon entered into eight built-to-suit lease transactions with special-purpose entities formed by Northstar and IPI. JA3782–3783. Amazon also entered into another lease transaction in January 2020, almost six weeks after it supposedly began an "extensive internal investigation" into Northstar's referral fees based on an email from a former Northstar employee. JA122, JA306–307, JA3783.

Kirschner was the assigned transaction manager for those transactions. JA915, JA1161. Each lease transaction was subject to review and approval ███████ ███████████████████████ JA1013, JA5042–5051, JA5054–5056, JA6051– JA6054. For example, ███████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████. JA5042–JA5044. Nelson did not engage the approval process or review any of the leases, nor was he involved in the meetings where approval was obtained. JA780, JA918.

The first lease transaction had the lowest yield Amazon had *ever* obtained on a built-to-suit data-center transaction in Northern Virginia. JA909, JA0307. Indeed,

████████████████████████████████████████████████. JA5027. █

████████████████████████████████████████████████████████

██████████████████████████████████ JA5027, JA6216.

While the yields increased for the subsequent lease transactions, they were ████████████. JA5577, JA5940–5941. Both Amazon and IPI employees admitted that the leases were at competitive market rates. JA3684, JA5005, JA5018. Amazon has not identified any developer that would have been able to provide the properties at lower prices. JA3261–3263, JA6026–6028, JA6030, JA7919. Nor has Amazon produced any evidence that the leases were above market rates. JA7918–7919.

By April 2020, the ████████████████████████████████████████ ████████████████ JA5075, JA8322. Projects had also been ████████████ JA5075. In short, Amazon received the land and buildings for which it bargained and has not claimed otherwise. JA345.

In February 2020, IPI and Amazon entered into a Lease Continuity Agreement that affirmed the lease contracts. JA5078. In December 2021, Amazon and IPI amended the leases and agreed to other new real estate transactions to be done between the parties, without Northstar's involvement. JA4605. IPI and Amazon also agreed to enter into a separate purchase agreement under which IPI would sell

Amazon four of the planned buildings ███████████████████████████

████████████████████████████████████████████████████████████

███████████████████████ JA4607, JA7924–7925, JA8314–8318. Amazon

did not conduct a separate market analysis, review comparable transactions, or

consult experts prior renegotiating this agreement. JA356, JA7930–7931.

## III.    The Direct Purchase Transactions

### i.    *White Peaks*

In January 16, 2019, two Northstar employees—Kyle Ramstetter and Will

Camenson—formed White Peaks Capital, LLC ("WPC"). JA390, JA3767. In

February 2019—unbeknownst to Watson, Nelson, or Kirschner—WPC took certain

real property under control from a third party, with the right to buy the property.

JA5611, JA5942, JA7081.

After discussion with several potential buyers, WPC proceeded with a deal to

sell the property to Amazon for $116.4 million in a simultaneous closing of the

contract WPC already had in place from April 2019 to buy the property for $98.67

million. JA403, JA786, JA3799, JA5209–JA5210, JA6706. The sale to Amazon

closed on July 29, 2019. JA7220.

Kirschner was the transaction manager assigned to the White Peaks

Transaction. JA5942–5946, JA7908. Amazon determined the transaction was in its

best interest given the location, price, and other factors, including that it was the

████████████████████████████████████████████████

████████████████████████████████████████████ "

JA5210; D.E. 1183-7. Amazon was aware of other potential purchasers, and ████

████████████████████████████████ . JA5209, JA7086, JA7568.

Amazon was aware that WPC had the right to purchase the property for $98.67 million, and was aware that it would be paying WPC an additional $17,700,000 to purchase the property from WPC (since the underlying contract was attached to Amazon's purchase agreement). JA5209, JA7553, JA7560, JA7566. The seller of the property to WPC, an experienced investor in data center land, testified that the price WPC sold to Amazon was below market price. JA379–JA380. Amazon ████

████████████████████████████████████████████████

████████████████████████ D.E.1183-19 at 160–61, 374.

The Watson Defendants were not involved with the White Peaks Transaction, and Amazon has not identified any evidence that would create an issue of fact on this point. JA370, JA373, JA549, JA551; *see also* JA3729 (district court observing that the "Watson Defendants … had no involvement in the direct purchase transactions and did not even learn of them until after the fact."). Because Ramstetter and Camenson were still employees of Northstar, Watson terminated their employment and threatened to sue them for usurpation of a corporate opportunity; this dispute ultimately settled, with Ramstetter and Camenson paying $5 million

pursuant to a written settlement agreement. JA281, JA538–JA539, JA7630. Watson did not pay any portion of that settlement to the Villanova Trust, Nelson, Kirschner, or Christian. JA281, JA7240–JA7241, JA7246–7248.

ii. *Blueridge*

In spring of 2019, Amazon considered leasing another parcel of land owned by a third party. D.E. 1183-4. Amazon attempted to identify and help developers take control of the land through a contract with the landowner. JA5626–5627, JA7047, JA8267–8269. In late July 2019, after Nelson's termination from Amazon, Nelson visited Herb Glimcher, principal of the Blueridge Group and a long-time developer of commercial properties. JA561; D.E. 1183-8 at 13–14. Glimcher asked Nelson to provide consulting services to assist with, among other things, their efforts to rezone the property and develop it for potential lease. JA561, JA3900, JA8289–8290; D.E. 1178-5; D.E. 1178-6. Nelson agreed, and helped to prepare budgets and schedules to develop shell buildings, and to rezone the property; this work resembled other consulting roles Nelson performed following his termination from Amazon. JA561–562, JA1642, JA3895–3896; D.E. 1178-7; D.E. 1178-8; D.E. 1178-9; D.E. 1178-10. The parties agreed to split any profits from their work on a 50/50 basis. JA562; D.E. 1178-11. Atherton, Nelson's counsel, formalized the agreement with Glimcher's attorney. JA5299–5233, JA8288–89; D.E. 1178-11.

In fall 2019, Nelson and Blueridge Group learned that Amazon had decided to buy the property, rather than lease it. JA562, JA1644–1646, JA8290–8291; D.E. 1183-4. Because there was no requirement to sell the property to any entity, JA3904, Amazon and Blueridge Group negotiated a fee for the assignment of the purchase agreement to Amazon. JA7226. Notably, Blueridge Group initially requested a $12 million assignment fee, but Kirschner, on behalf of Amazon, negotiated the *reduction* of this fee to $10 million. JA309–310, JA7074–7075, JA5220–5221. This fee is similar to another multimillion-dollar assignment fee Amazon paid to another developer on a different occasion after it changed its mind about leasing versus direct purchase. JA308, JA5219.

Amazon bought the Blueridge property for $83 million (including the assignment fee) on December 23, 2019, three weeks after it began its internal investigation. JA121–122, JA3807. The price was ███████████████████ ████████████████████████████████. JA5212, JA7056; D.E.1183-19 at 156–58. Amazon has not produced any evidence showing otherwise. Amazon ████████████████████████████████████████████ ████████████. D.E. 1183-19 at 160–61, 374.

## IV.  The Summary Judgment Decision

After the parties engaged in extensive discovery—and Amazon thrice amended its complaint—Defendants moved for summary judgment on all claims.

Amazon's response failed to dispute many material facts or address several of Defendants' key arguments. JA5243.

Ultimately, the district court granted summary judgment to Defendants on all but two sets of claims—Amazon's claims against the Watson Defendants for tortiously interfering with Nelson and Kirschner's employment contracts, and related conspiracy-to-tortiously-interfere claims against Nelson, Kirschner, and the Watson Defendants. JA3732–3733, 3742. Amazon leaves much of this decision unchallenged on appeal. Amazon, for example, does not challenge the district court's conclusion that the breach-of-contract claims against Nelson and Kirschner fail because their CNIAAs do *not* prohibit Nelson and Kirschner from "entering into agreements to receive kickback payments linked to Amazon deals." JA3734–3741.

Instead, Amazon (Br. 20–58) appeals this decision as to just four sets of claims—its RICO claims, fraud claims, unjust enrichment and conversion claims, and conspiracy claim against Atherton. As to the RICO claim, the district court determined Amazon failed to identify sufficient evidence to establish (1) injury to business or property or (2) an enterprise. JA3726–3730. The fraud claims, the district court determined, likewise failed for lack of damages. JA3730–3732. As to the unjust enrichment and conversion claims, the district court held them barred by contracts covering the same subject matter, and because Amazon had not alleged, much less shown, that it lacked adequate remedies at law. JA3745–3747. And it

rejected the conspiracy claim against Atherton after determining that it was "undisputed that Defendant Atherton was acting in a representative capacity," that there was "no evidence" Atherton formed an agreement to interfere with Amazon's employment relationships, and that Amazon did "not contest" that under Virginia law an agent cannot be liable for "conspiring" with its principal. JA3742.

## STANDARD OF REVIEW

This Court "review[s] a district court's decision to grant summary judgment de novo, applying the same legal standards as the district court." *Carter v. Fleming*, 879 F.3d 132, 139 (4th Cir. 2018) (quotation marks and citation omitted).

## SUMMARY OF ARGUMENT

Amazon's claims fail because it did not show actual damages and because its ever-shifting legal theories cannot be stretched to cover this commercial contractual dispute. Amazon's failure to prove actual damages dooms its RICO claims. It also did not show relationships among the members of the alleged RICO enterprise, nor show a common purpose; its RICO claims fail for these reasons as well. And its Virginia-law fraud claims likewise founder for lack of actual damages. Virginia law also forecloses Amazon's unjust enrichment and conversion claims, since it can instead sue for breach of contract; indeed, Amazon did—and lost. Finally, Amazon cannot succeed on its civil conspiracy claim against Atherton because Virginia law does not allow plaintiffs to sue agents for "conspiring" with their principals.

**ARGUMENT**

## I. Amazon's Civil RICO Claim Fails for Two Separate Reasons.

This Court has long cautioned that "the multiple state and federal laws bearing on transactions" should not be "eclipsed or preempted" by RICO. *U.S. Airline Pilots Ass'n v. Awappa, LLC*, 615 F.3d 312, 317 (4th Cir. 2010) (quotation marks and citation omitted). And this Court has insisted that it "will not lightly permit ordinary business contract or fraud disputes to be transformed into federal RICO claims." *Flip Mortg. Corp. v. McElhone*, 841 F.2d 531, 538 (4th Cir. 1988); *see also GE Inv. Priv. Placement Partners II v. Parker*, 247 F.3d 543, 549 (4th Cir. 2001) ("RICO liability is reserved for 'ongoing unlawful activities whose scope and persistence pose a special threat to social well-being.'") (quoting *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989)). Yet that is precisely what Amazon seeks to do. Because its summary judgment evidence showed neither actual damages nor an enterprise, its RICO claims fail. *See, e.g., Dickerson v. TLC The Laser Eye Ctr. Inst., Inc.*, 493 F. App'x 390, 394 (4th Cir. 2012) (including actual damages and enterprise among elements of civil RICO claim).

### A. Amazon failed to provide evidence of a RICO injury.

*i.* *The civil RICO statute requires actual damages, and "kickbacks" paid by a third party are not actual damages.*

A civil RICO plaintiff must establish that it was "injured in [its] business or property by reason of" a RICO violation. 18 U.S.C. § 1964(c); *see also Dickerson*,

493 F. App'x at 394 (plaintiff "can only recover if he shows that his injury caused by the RICO violation damaged his business or property"). And courts have held that this requirement demands a *concrete financial loss*. *See, e.g., Bowen v. Adidas Am. Inc.*, 84 F.4th 166, 177 (4th Cir. 2023) (affirming determination that loss of NCAA eligibility could not support a RICO action because it was "untethered to any concrete interest like compensation").[4]

Courts apply this requirement even in cases involving alleged kickbacks. *See West Virginia v. Moore*, 895 F. Supp. 864 (S.D.W. Va. 1995) (rejecting civil RICO claim based on kickbacks for lack of RICO injury); *Marlboro v. Scannapieco*, 545 F. Supp. 2d 452, 459 (D.N.J. 2008) (rejecting civil RICO claim predicated on alleged bribery because "amorphous injuries to a right to its employees' honest services are *not* 'concrete financial loss[es]' recoverable under RICO") (emphasis in original). In *Moore*, for example, the court explained that while "equitable doctrines … often focus on the defendant, forcing him to give up ill-gotten gains," civil RICO "looks

---

[4] *See also, e.g., Gomez v. Wells Fargo Bank, N.A.*, 676 F.3d 655, 661–662 (8th Cir. 2012) (plaintiffs failed to allege "concrete financial loss" where they admitted they paid market rates for services); *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 227 (2d Cir. 2008) ("A plaintiff asserting a claim under 18 U.S.C. § 1964(c) must allege *actual*, quantifiable injury.") (emphasis in original); *Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000) ("the injury to business or property element of section 1964(c) can be satisfied by allegations and proof of actual monetary loss"); *Steele v. Hosp. Corp. of Am.*, 36 F.3d 69, 70 (9th Cir. 1994) (holding civil RICO claim "requires proof of concrete financial loss, and not mere injury to a valuable intangible property interest").

at the financial position of the plaintiff." 895 F. Supp. at 871. For this reason, the court in *Moore* held that kickback payments were themselves insufficient to establish injury. *Id.* And this Court reached the same conclusion in *Baehr v. Creig Northrop Team, P.C.*, where it held—in the context of the Real Estate Settlement Procedures Act (RESPA)—that kickbacks themselves do *not* constitute a "concrete injury." 953 F.3d 244, 254 (4th Cir. 2020).

This overwhelming precedent forecloses Amazon's attempt to equate kickbacks with damages. Br. 21–24. As the foregoing decisions recognize, it does not harm a plaintiff for one third party to pay "kickbacks" to another. The way for a plaintiff to recover kickbacks is not via damages, but is instead via "equitable doctrines," such as disgorgement and unjust enrichment. *Moore*, 895 F. Supp. at 871. And this Court has recently held that private RICO plaintiffs *cannot obtain equitable relief. Hengle v. Treppa*, 19 F.4th 324, 354 (4th Cir. 2021).

Amazon ignores much of this precedent, and the caselaw on which it relies does not support its position. Amazon cites *Williams Electronics Games, Inc. v. Garrity* for the proposition that kickbacks can be used as an estimate of damages. 366 F.3d 569, 576 (7th Cir. 2004). But Amazon ignores that this Seventh Circuit decision found no RICO enterprise and did not discuss RICO injury at all; the language Amazon quotes comes from a discussion of *Illinois fraud law*. Amazon also relies on *Continental Management, Inc. v. United States*, but that was not a

17

RICO case at all; it concerned the federal government's claim against defendants who "knowingly participated in or induced [its] agent's breach of duty." 527 F.2d 613, 616 (Ct. Cl. 1975). The Seventh Circuit's decision in *S.C. Johnson & Son, Inc. v. Transportation Corporation of America, Inc.* is likewise irrelevant: Amazon plucked the quoted language (speculating about the economic effects of bribery) from a discussion concerning *preemption*, and nothing in the decision discusses the civil RICO statute's injury requirement. 697 F. 3d 544, 559 (7th Cir. 2012).

Amazon's other cases are also inapposite. *Potomac Electric Power Company v. Electric Motor & Supply, Inc.* involved a party who "bargain[ed] for a service, [wa]s told that the service ha[d] been performed, [wa]s charged for the service, and d[id] not in fact receive the service." 262 F.3d 260, 265 (4th Cir. 2001). Here, Amazon received the buildings and land for which it bargained, some even under budget. JA345, JA3672–3673, JA5015, JA5075.

Similarly, in *Hellenic Lines, Ltd. v. O'Hearn*, the plaintiff sufficiently alleged injury where "it paid for services it never received." 523 F. Supp. 244, 248 (S.D.N.Y. 1981). And *City of New York v. Citisource*, an attachment case that involved the collateral estoppel effect of criminal convictions, was considered and rejected by the district court in *Moore*. 679 F. Supp. 393 (S.D.N.Y. 1988); *Moore*, 895 F. Supp. at 871. Unlike *Citisource*, this case is not at a preliminary stage, and there have been no criminal convictions. Indeed, the United States recently *dismissed* guilty pleas it

had obtained from Christian and Ramstetter, after determining those pleas were "not in the interest of justice," and affirmatively stated it was declining to prosecute any of the Defendants in this case. JA5243; 1:23-cr-00027-RDA (E.D. Va.) (D.E. 20).

Likewise, in *Hino Motors Manufacturing U.S.A., Inc. v. Hetman*, the court considered kickbacks in awarding damages in a default judgment because the plaintiff presented unrebutted evidence that the costs of the kickbacks "were passed on to [the plaintiff] through higher purchase prices." 2022 WL 16709717, at *3 (E.D. Mich. Aug. 4, 2022). No such evidence exists here. And finally, *Dolan v. JetBlue Airways Corporations* was a decision at the motion to dismiss stage where the plaintiff alleged that JetBlue "trick[ed] consumers into thinking the charge is entirely passed through in a number of ways." 385 F. Supp. 3d 1338, 1354 (S.D. Fla. 2019).

In short, accepting Amazon's kickbacks-equal-damages theory would give private plaintiffs an end-run around the RICO statute's express language and this Court's decisions. The Court should refuse to do so.

### ii. *Amazon failed to provide evidence of inflated costs.*

Because Amazon must provide proof that it suffered a concrete financial loss, it cannot simply point to the alleged kickbacks and leave it at that. Rather, at summary judgment, Amazon was obligated to provide "evidence establishing a genuine issue of material fact that [it] in fact paid inflated prices." *Bowe v. Public Storage*, 106 F. Supp. 3d 1252, 1265 (S.D. Fla. 2015); *see also Sowell v. Butcher*

*Singer, Inc.*, 926 F.2d 289, 297–302 (3d Cir. 1991) (affirming verdict where plaintiff failed to show the difference between the price paid for a security and the security's true value where plaintiff had asserted that the stock was worthless); *Maio*, 221 F.3d at 494 (affirming dismissal of complaint where plaintiffs did not show they "paid too much for the health insurance they received"); *Ivar v. Elk River Partners, LLC*, 705 F. Supp. 2d 1220, 1235 (D. Colo. 2010) (finding no RICO injury because the amount plaintiffs paid was the value of the property); *Impress Cmmc'ns v. Unumprovident Corp.*, 335 F. Supp. 2d 1053, 1064 (C.D. Cal. 2003) (finding no RICO injury where there was no proof that "the benefits given were less than those purchased with the premiums").

To show that it paid inflated prices, Amazon necessarily needed to demonstrate the *actual* value of the property, which plaintiffs routinely do via valuation experts.[5] Amazon failed to do so and admits it has not done any market analysis of the lease transactions or direct purchase transactions. JA356, JA3285, JA7930–JA7931. As to the first lease transaction, Amazon's corporate representative conceded that █████████████████████████████████████

---

[5] *See, e.g., Martz v. Day Dev. Co., L.C.,* 35 F. 4th 220, 229 (4th Cir. 2022) (discussing valuation of various parcels before and after services were rendered); *United States v. Werner*, 36 F.3d 1095 (table), 1994 WL 507461, at *2-7 (4th Cir. 1994) (discussing appraisal of real property); *In re Morris Commc'ns NC, Inc.,* 914 F. 2d 458, 469 (4th Cir. 1990) (discussing "various methods for arriving at a market value for any asset"); JA2444 (Amazon's expert noting he has "led large valuation engagements that included the appraisal of real estate").

███████████████████████████. JA6023–6024, JA6028. And as to the other lease

transactions, Amazon's representative similarly admitted that Amazon did not have

external evidence suggesting that the price should have been lower. JA3261–3263,

JA6030–6031. Nor did Amazon disclose any damages based on overpayment in its

interrogatory responses or its initial disclosures.

Rather, Amazon now contends, without support, that data centers are too

"highly bespoke and idiosyncratic" to be valued. Br. 28. Amazon, however, was at

times █████████████████████ in Northern Virginia, and clearly has access

to data about its own transactions. JA338, JA5705–5706; D.E. 1183-19 at 120–122.

Moreover, the ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████ JA4663, JA4687. Amazon's claimed damages are thus

nothing but speculation. *See Miller v. Asensio & Co.*, 364 F.3d 223, 232 n.6 (4th Cir.

2004) (under RICO, *"the measure of damages is 'the harm caused by*' the illegal

activity, which must be proven by 'competent proof, not based upon mere

speculation and surmise'") (emphasis in original) (citing *Ticor Title Ins. Co. v.*

*Florida*, 937 F.2d 447, 451 (9th Cir. 1991)).

Amazon's only hard "evidence" of inflated prices are the alleged kickbacks themselves.[6] And kickbacks standing alone are insufficient to warrant an "inference of inflated payments." Br. 23. That is especially true where, as here, all of the evidence concerning the properties' value suggests the prices were *at or below market values*. The initial lease transaction carried the lowest yield that Amazon ever had for a Northern Virginia data center. JA909. And the subsequent leases were at competitive market rates (or even below-market rates). JA5018, JA3684.

Nor can the speculative opinion from Amazon's "damages" expert save its RICO claim. Amazon's brief repeatedly points to its expert's opinion that, if the kickback scheme did not exist, Amazon would have theoretically been able to negotiate a lower overall lease budget (assuming Watson and IPI agreed to do so). Br. 24-26 (citing JA2460 five separate times). But that same expert admitted to not

---

[6] Amazon briefly points to alleged harms relating to a broker rebate paid to Northstar, Br. 28–30, but does not grapple with the district court's finding that Amazon failed to properly disclose that harm. Amazon did not allege wrongful conduct relating to these payments (which were properly made to the Watson Defendants as the purchasers of the property) in any of its complaints; nor did it include this information in its Rule 26(a)(1) disclosures or in response to any of Defendants' interrogatories. Amazon disclosed this alleged harm *only* in its expert report. *See* Br. 28–29 n.4. "[A]n expert report may not simply stand in the place of Plaintiff's required 26(a)(1)(A)(iii) disclosures." *Companion Prop. & Cas. Ins. Co. v. U.S. Bank Nat'l Ass'n*, 2016 WL 3452734, at *2 (D.S.C. June 24, 2016). Exclusion was thus proper. *See Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 512 n.10 (4th Cir. 2002). And regardless, the payment of these rebates is not causally linked to any injury suffered by Amazon: ███████████████████████████████ ███████████████████████████████ D.E. 1183-13, ███████████████████████████ D.E. 1183-12.

22

having done any market analysis. JA3285. This sort of "mere speculation" cannot create a genuine issue of material fact at summary judgment. *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985); JA6033 (████████████████████████████ ████████████████████████████). After all, referral fees are common in this industry. JA1112–1114, JA2401, JA4147–4148, JA5028. There is simply no evidence indicating Amazon would have received lower prices from anyone else.

The district court thus correctly found that Amazon could not "*prove* that it overpaid because there is no evidence in the summary judgment record establishing the market value of the properties at the time of the lease and direct purchase transactions." JA3728 (emphasis in original). As the district court observed, "Amazon's decision not to conduct a market analysis, at least as to the leases, may have been a conscious one, given that there is evidence in the summary judgment record indicating that the values of the leased properties exceed the prices Amazon paid" and that "Amazon itself chose to affirm the leases." JA3728; *see also* JA3731 ("Amazon has not put forth any evidence that the market value of the properties involved in the White Peaks Transaction and the Blueridge Transaction was anything other than what it paid for those properties"). Amazon fails to confront the district court's conclusion, instead suggesting that requiring market evidence "would create a new safe harbor" for "fraudsters." Br. 28. Yet this argument ignores that there may be *other* causes of action, with different elements and remedies, to address

kickbacks; RICO "does not cover all instances of wrongdoing." *U.S. Airline Pilots Ass'n*, 615 F.3d at 317 (quotation marks and citation omitted); *see also infra*, Section II.B (discussing Amazon's failure to bring breach-of-fiduciary-duty claims).

### B. Amazon failed to establish a RICO enterprise.

Amazon's RICO claims fail for a further, independently sufficient reason: Amazon failed to satisfy the statute's "enterprise" element. Under RICO, "an association-in-fact enterprise is simply a continuing unit . . . with a common purpose." *Boyle v. United States*, 556 U.S. 938, 948 (2009); *accord United States v. Pinson*, 860 F.3d 152, 162 (4th Cir. 2017). A RICO enterprise "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946. Here, Amazon's theory fails on two separate grounds: It showed *neither* the requisite relationships among the alleged members of the enterprise, *nor* a common purpose.[7]

---

[7] Amazon's RICO claim against Atherton further fails because Amazon failed to show that Atherton did anything unlawful or fraudulent in the formation or organization of the entities at issue. JA4021–4023, JA4103, JA4159–4160. Providing legal services does not constitute "operation or management" of an enterprise under RICO. *See Goodweather v. Parekh*, 2021 WL 4149030, at *10 (E.D. Va. Sept. 10, 2021) ("Providing services that benefit an enterprise, even if those services are important and indispensable, is not sufficient to support RICO liability because it does not amount to operation or management."); *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 521–22 (2d Cir. 1994) (dismissing RICO claim against attorney who "acted as no more than [an] attorney"); *Menuskin v. Williams*, 940 F. Supp. 1199, 1210 (E.D. Tenn. 1996) (dismissing RICO claim against attorney who

Amazon's failure on this score is well illustrated by its inability to even define the alleged enterprise. Amazon initially alleged that two separate enterprises existed—one for the lease transactions, and one for the purchase transactions. JA111. In its Second Amended Complaint, Amazon abandoned these theories and alleged a single RICO enterprise. D.E. 150 at 5. And in its operative Third Amended Complaint—the first to name Atherton as a defendant—Amazon contended that *all* Defendants constituted an "association-in-fact enterprise" and that "*[e]ach Defendant* participated in the operation or management of the kickback scheme … which includes but is not limited to the Lease Transaction conduct and Direct Purchase conduct alleged herein." JA236 (emphasis added).

The summary judgment evidence directly contradicted Amazon's latest theory. As the district court observed—and Amazon does not dispute on appeal—it was undisputed that the Watson Defendants "had no involvement in the direct purchase transactions and did not even learn of them until after the fact. Likewise, there is no evidence that the Watson Defendants conspired with Atherton, Christian

---

did not do "anything more than provide standard, routine services"), *aff'd in part & rev'd in part on other grounds*, 145 F.3d 755 (6th Cir. 1998); *Gilmore v. Berg*, 820 F. Supp. 179, 183 (D.N.J. 1993) (lawyer's preparation of allegedly misleading tax opinion letter constituted legal services, not participation in affairs of enterprise).

Kirchner, and/or Nelson to create the entities through which Christian Kirschner and Nelson received purportedly illicit funds." JA3729 (citations omitted).

Accordingly, the district court observed, Amazon has "attempted to lump together Defendants connected to three distinct transactions (the lease transactions, the White Peaks Transaction, and the Blueridge Transaction) into a single enterprise because two Amazon employees were at the center of each transaction." JA3729. The law is clear that such hub-and-spoke structures are insufficient to establish a RICO claim. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 374–75 (3d Cir. 2010) (quoting Gregory P. Joseph, Civil RICO: A Definitive Guide 106 (3d ed. 2010) that a "rimless hub-and-spoke configuration would not satisfy the 'relationships' prong of *Boyle*'s structure requirement"); *Donaldson v. Primary Residential Mortg., Inc.*, 2020 WL 3184089, at *26 (D. Md. June 12, 2020) (dismissing RICO claim based on kickbacks where enterprise was "one of the 'hub and spoke' variety") (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002)); *Cedar Swamp Holdings, Inc. v. Zaman,* 487 F. Supp. 2d 444, 451 (S.D.N.Y. 2007) (holding "hub and spoke" scheme where husband and wife used different accomplices for each fraudulent transaction failed to constitute a RICO enterprise).

As the district court explained, here there is no evidentiary basis connecting the spokes—the Watson, White Peaks, and Blueridge defendants—to each other. *Donaldson*, 2020 WL 3184089, at *26 (dismissing complaint because it was "bereft

of allegations suggesting that the participating mortgage lenders were working together in furtherance of the scheme"). Each group engaged in distinct transactions, with different structures, for their own benefit.

Amazon does not dispute any of this. Instead, it argues that the "rimless-wheel or hub-and-spoke standard … does not apply to RICO's enterprise element." Br. 38. In support, it relies on *United States v. Griffin*, which discusses the differences between conspiracy charges and RICO charges. 660 F.2d 996, 1000 (4th Cir. 1981). But *Griffin* did *not* hold that hub and spoke conspiracies can satisfy the RICO enterprise element. *Id.* To the contrary, this Court has since affirmed dismissal of RICO claims based on the "rimless wheel" theory. *See Vuyyuru v. Jadhav*, 2011 WL 1483725, at *17–18 (E.D. Va. Apr. 19, 2011) (quoting *Ins. Brokerage*, 618 F.3d at 369, and dismissing RICO claims where plaintiff did not allege connections between separate arms of alleged enterprise), *aff'd*, 501 F. App'x 294 (4th Cir. 2012).

ii.  *Amazon's "core group" theory is forfeited and meritless.*

Having failed to establish the theory it advanced below, Amazon now contends for the first time on appeal that a "core group" consisting of Nelson, Kirschner, and Atherton "took part in *every* fraud and interacted largely with the same overlapping group in each transaction." Br. 46–47. Amazon forfeited this

argument by failing to raise it. [8] *See, e.g., Gilbert v. United States Bureau of Alcohol, Tobacco, Firearms & Explosives*, 805 F. App'x 198, 202 (4th Cir. 2020).

Regardless, Amazon's argument fails on the merits. Amazon is simply recasting the hub-and-spoke structure of its alleged enterprise in different terms. The summary judgment evidence established that the Watson Defendants were parties to a contract with Christian (who is not a defendant and not alleged to be part of the "core group"), acted in their own interests with respect to the lease transactions, and did not participate or know about the direct purchase transactions. *See Nunes v. Fusion GPS*, 531 F. Supp. 3d 993, 1006 (E.D. Va. 2021) (dismissing RICO claim for lack of enterprise where plaintiff alleged that defendants and three others engaged in "independent, parallel conduct" and that "the entities and persons involved had different memberships and methods—even assuming they all shared the same generalized 'motive'") (citing *Pinson*, 860 F.3d at 162). The Watson Defendants did not share in the profits of this newly alleged enterprise, had no control over it, and did not take direction from it. These facts foreclose Amazon's attempt to show a RICO enterprise.

---

[8] Amazon contends in passing that the leases alone are sufficient to establish an enterprise. Br. 43. Amazon did not raise this argument below; it has thus forfeited it.

### iii. *Amazon's newfound common-purpose arguments also fail.*

On appeal, Amazon has also altered its arguments as to the common purpose of the enterprise. Amazon previously contended that Defendants shared a "common purpose of defrauding Amazon to enter into transactions that Defendants used to enrich themselves at Amazon's expense." JA626. Amazon now contends for the first time that Defendants shared a common purpose of "extracting financial gain from Amazon real-estate deals procured through kickbacks." Br. 40.

This Court has squarely rejected such an expansive notion of RICO liability. In *Pinson*, while the "purpose of each venture . . . was to enrich its members", the plaintiff failed to establish an enterprise because "[a]ny illicit profits did not carry over to the members of the other ventures." 860 F.3d at 162. In other words, bilateral transactions with a common victim have no financial benefit for the alleged organization as a whole. *See AlAbood v. Elshamari,* 217 F.3d 225, 238 (4th Cir. 2000) (holding fraud case did not "warrant RICO treatment" because "there was only one victim"); *Jadhav*, 2011 WL 1483725, at *19 (holding that a "single super enterprise" was not actionable because the plaintiff failed to demonstrate all members shared a common purpose). Here, there was no dispute that the lease transactions, White Peaks transaction, and Blueridge transaction were all separate and benefited only the participants in those transactions and not some broader enterprise.

Amazon similarly contends that Defendants shared a common purpose of concealing the existence of kickbacks. Br. 40 (citing *United States v. Fattah*, 914 F.3d 112, 164–67 (3d Cir. 2019)). Yet concealment itself is not a RICO predicate act, so a *purpose* of concealing something alone is insufficient to establish a RICO enterprise. Amazon also offered no evidence that all the Defendants even knew about all the transactions, much less shared an intent to conceal "kickbacks."[9] Moreover, Amazon did not raise this argument below and so forfeited it. JA236, JA5293–5294.

## II. Amazon's Fraud Claims Fail for Lack of Actual Damages.

Like its RICO claim, Amazon's fraud claim fails because Amazon failed to provide evidence of actual damages. Amazon's failure on this score is even clearer because its fraud claim is subject to a higher evidentiary standard. Although Amazon improperly conflates its fraud and RICO claims, it is well-established under Virginia law that "[a] plaintiff asserting a cause of action for fraudulent inducement bears the burden of proving by *clear and convincing evidence* the following elements: '(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to

---

[9] Amazon cites a recording between Ramstetter and Watson to support its concealment argument. Br. 40 (citing JA3692). But that recording provides no factual support for Amazon's argument—Watson does not indicate agreement with the "purpose" Amazon now asserts.

the party misled.'" *Persaud Companies, Inc. v. IBCS Grp., Inc.*, 425 F. App'x 223, 226 (4th Cir. 2011) (emphasis added) (quoting *Evaluation Research Corp. v. Alequin*, 439 S.E.2d 387, 390 (Va. 1994)).[10] And Virginia law is equally clear that fraud claims do not authorize the remedy Amazon seeks here—disgorgement of alleged kickbacks. Because Amazon did not present evidence that would permit a jury to find actual damages by clear and convincing evidence, Virginia law forecloses its fraud claims.

## A. Amazon did not address, much less refute, the fraud damages arguments.

There are two independent and equally fatal problems with the damages element of Amazon's fraud claim. First, the district court correctly concluded that Amazon conceded the issue by failing to respond to Defendants' arguments on this point. JA3732; *see, e.g., Kinetic Concepts, Inc. v. Convatec Inc.,* 2010 WL 1667285, at *8 (M.D.N.C. Apr. 23, 2010) (collecting cases for "the general principle that a party who fails to address an issue has conceded the issue").

On appeal, Amazon challenges that conclusion on the ground that its summary judgment brief distinguished some state law cases on fraud. Br. 25 (citing JA655–656). But Defendants cited those cases to show that Amazon could not establish its fraud claim's *reliance* element, *not* as damages cases. D.E. 1205 at 22–23. Amazon

---

[10] Defendants raised this standard in their summary judgment motion, D.E. 1205 at 15, 17, and Amazon failed to contest it.

also argues that it "contest[ed] Defendants' assertions that it could recover damages only by presenting expert evidence of market values," pointing to arguments in its summary judgment brief concerning the injury element of its RICO claim. Br. 35. The *fraud* section of Amazon's summary judgment brief did not incorporate those RICO arguments, however. JA653–656. Regardless, Amazon's RICO claims and fraud claims are governed by different law (federal and Virginia law, respectively) and subject to different evidentiary standards. Distinguishing cases that have nothing to do with an issue hardly "presses" the issue. Because Amazon failed to present any argument concerning the damages element of its common law fraudulent inducement claim, the district court correctly found that it conceded the argument.

Second, Amazon failed to present adequate evidence of actual damages in any event. Virginia law is clear: Where the alleged fraud involves "a commercial transaction involving the transfer of real property, … the measure of damages [is] 'the difference between the actual value of the property at the time the contract was made and the value that the property would have possessed had the [fraudulent] representation been true." *Klaiber v. Freemason Assocs., Inc.*, 587 S.E.2d 555, 558-59 (Va. 2003) (quoting *Prospect Dev. Co. v. Bershader*, 515 S.E.2d 291, 300 (Va. 1999)); *accord Sharma v. USA Int'l, LLC*, 851 F.3d 308, 312 (4th Cir. 2017) (noting that when a fraud claim concerns "a transaction [that] involves a transfer of goods or property, the proper measure of damages is 'the difference between the actual

value of the property at the time the contract was made and the value that the property would have possessed had the representation been true.'" (quoting *Prospect Dev. Co.*, 515 S.E.2d at 300)). This rule applies to both sales and leases of property, as recognized by *Sharma*'s discussion of the ground lease in *Patel*. *Id.* at 314 (citing *Patel v. Anand, LLC*, 564 S.E.2d 140, 143 (Va. 2002)).

State and federal courts in Virginia have consistently applied this standard in fraud cases related to the transfer of real property. *See Nahigian v. Juno-Loudon, LLC*, 2010 WL 3418179, at *12 (E.D. Va. Aug. 23, 2010) (finding failure of proof because plaintiff failed to show difference in value was due to overpayment rather than change in market conditions); *Henderson v. Truist Bank*, 2022 WL 17417167, at *9 (E.D. Va. Dec. 5, 2022) (holding plaintiff needed to allege "a difference in the actual value of his home and the bargained for value . . . to have properly pleaded injury"); *Celeste v. Bayliss*, 1986 WL 401809, at *4 (Va. Cir. Ct. July 23, 1986).

Amazon understood this requirement when it pled its claims, alleging that it was injured by "purchas[ing] real property in Virginia unlawfully inflated above its fair market value," that it paid "$17,700,000 in excess of the fair market value of the [White Peaks Property]," and that the leases were not "fair market deals." JA251; *see also* JA258 (fraud claim alleging "Amazon would not have proceeded with the transactions if it had been aware that the prices were inflated"). But as the district

33

court recognized, Amazon's facts did not match what it pled and fell short of the threshold to overcome summary judgment.

For example, the district court noted that Amazon made no effort to present any evidence demonstrating the market value of the properties or leases. JA3731–3732. Amazon's own purported damages expert admitted he offered no opinion on the value of the properties or leases, or even an opinion on damages. JA3731, JA2433 ("I was not asked to opine on Amazon's recoverable damages at all."), JA3285 ("I have not been asked to analyze [whether the leases were at market]"); JA3291 ("I'm not opining on Amazon's damages related to any count."). As the district court pointed out, the evidence indicates Amazon *did not* overpay in the transactions at issue, and it appeared that Amazon made a deliberate decision not to present evidence about the market value of the properties for this reason. JA3728.

In sum, Amazon failed to produce evidence that would allow a reasonable juror to find that it satisfied the final element of its fraud claim by clear and convincing evidence—that it suffered actual damages.

## B. No Virginia fraud cases support Amazon's no-damages-necessary theory.

Having failed to show actual damages, Amazon tries to save its fraud claim by arguing that it can measure its damages by the amount of the alleged kickbacks. No authority of Virginia law endorses this novel theory. Amazon cites just two Virginia cases for this point—*Millboro Lumber Co. v. Augusta Wood Prods. Corp.*,

125 S.E. 306 (Va. 1924), and *Byrd v. Crosstate Mortg. & Investments, Inc.*, 34 Va. Cir. 17 (1994). Br. 32. Neither supports Amazon's theory.

*Millboro* held that Virginia law allows plaintiffs to elect between two sorts of remedies for fraudulent inducement claims—benefit of the bargain damages or the equitable remedy of rescission. 125 S.E. at 421. Virginia courts have long adhered to this rule.[11] *See United States v. Idlewild Pharmacy, Inc.*, 308 F. Supp. 19, 22 (E.D. Va. 1969) (collecting cases); *Med-Therapy Rehab. Servs., Inc. v. Diversicare Corp. of Am.,* 16 F.3d 410 (table), 1994 WL 34745, at *2 (4th Cir. 1994) ("A party who brings suit on the basis of an allegedly fraudulent contract must choose to prove fraud and seek recovery under the terms of the contract or to rescind the contract and pursue restitution if applicable. A party may not do both."); *Vertex Telecom, Inc. v. XO Commc'ns, Inc.*, 2006 WL 3746142, at *2 (E.D. Va. Dec. 14, 2006).

When a party elects to rescind a fraudulently induced contract, Virginia courts may use equitable powers to craft a remedy that "restore[s] the parties to the position they occupied before entering into the contract." *Millboro Lumber Co.*, 125 S.E. at 310; *Devine v. Buki*, 767 S.E.2d 459, 465 (Va. 2015). Virginia courts regularly cite *Millboro* for this rule in rescission cases. *See Lynnwood Tech Holdings LLC v. NR*

---

[11] When federal courts hear state-law claims, "matters of remedy . . . are governed by the law of the place where the action is brought." *Ruffin v. Bank of New York Mellon*, 2013 WL 12140483, at *3 (E.D. Va. May 21, 2013) (quoting *Willard v. Aetna Cas. & Sur. Co.*, 193 S.E.2d 776, 778 (Va. 1973)).

*Int. LLC.*, 2017 WL 1238033, at *62–63 (Va. Cir. Ct. Feb. 24, 2017) (applying rule in data center case, noting impracticability of placing parties in *status quo ante*); *Zaklit v. Glob. Linguist Sols., LLC*, 53 F. Supp. 3d 835, 851–52 (E.D. Va. 2014).

Accordingly, Amazon is wrong to suggest that *Millboro* in all circumstances "require[s] the party profiting from the fraud to surrender the benefit he has received." Br. 32. *Millboro* does *not* authorize the disgorgement remedies Amazon seeks where the plaintiff chooses to keep the contract: Where the plaintiff chooses not to rescind the contract, Virginia law provides for traditional benefit-of-the-bargain damages. Another case Amazon cited in its summary judgment brief, *Avalonbay Cmtys., Inc. v. Willden*, 2008 WL 2780983, at *2–3 (E.D. Va. July 16, 2008)—a case involving kickbacks—demonstrates this point. There, the damages were the amounts the plaintiff paid on invoices for work never done—the benefit of the bargain. *Id.* The amount of the kickbacks *was not* used as the measure of damages. *Id.* at *2–6.

Here, Amazon has not sought to rescind any of the transactions at issue, presumably because it has no interest in forgoing the significant profits it has obtained and will obtain. JA560 (AWS reported revenue of around $233M per data center in 2019 alone). Amazon cannot therefore rely on *Millboro* to demand disgorgement for its fraud claim.

*Byrd* also does not help Amazon, for it does not discuss the damages or other remedies that might be available as the plaintiff proceeded beyond the motion-to-dismiss stage.[12] Further, *Byrd* is a *breach-of-fiduciary-duty* case; it involved a real estate broker who under Virginia law "owes his principal the duty to use utmost fidelity to him and must disclose to him all facts within the broker's knowledge which may be material to the transaction, or which might influence the principal in deciding upon a course of action." 34 Va. Cir. 17, at *3. *Byrd* thus provides no authority for the remedies Virginia law authorizes for fraud claims. *See, e.g., Avalonbay Cmtys., Inc.*, 2008 WL 2780983, at *6 (distinguishing between fraud claim and breach-of-fiduciary-duty claim). Indeed, Amazon's own brief recognizes the difference between fraud and fiduciary-duty cases. Br. 35 n.9 (distinguishing case because it involved "agent's fiduciary breach" and thus "did not involve a fraud claim at all"). [13]

---

[12] *Byrd*, a trial court opinion, is not binding on this Court. *Liberty Mut. Ins. Co. v. Triangle Indus.*, 957 F.2d 1153, 1156 (4th Cir. 1992). Whatever weight it may have, that weight is insufficient to overcome the consistent holdings from Virginia's courts that equitable remedies in a fraudulent inducement case are employed, if at all, only when a party invokes equity by electing rescission of the fraudulently induced contract, and only as necessary to put the parties in substantially the same position they were before the contract was entered. *See Assicurazioni Generali, S.p.A. v. Neil*, 160 F.3d 997, 1002 (4th Cir. 1998).

[13] Amazon also cites a number of outside-Virginia breach-of-fiduciary-duty cases, but these cases involve a different claim *and* different jurisdictions. For example, *Kewaunee Scientific Corp. v. Pegram*, 503 S.E.2d 417 (N.C. App. 1998), is premised on proving a violation of a North Carolina criminal statute—"commercial bribery."

Amazon could have brought fiduciary-duty claims but chose not to do so. It brought and then dropped breach-of-contract claims against the Watson Defendants under the leases. JA154–155. And it brought breach-of-contract claims against Nelson and Kirschner, alleging they violated their CNIAAs with the same conduct underlying the fraud claim; Amazon lost those breach-of-contract claims on summary judgment and did not appeal that ruling. JA263–267, JA3734–3741.[14]

Amazon asserts that a claim for breach of the duty of loyalty or fraud "can give rise to the same remedies." Br. 32 n.7. For this proposition it cites Section 699 of the Dobbs treatise, but this section contains no such statement, and is explicit that it is a claim for *breach of fiduciary duty* that may give rise to various remedies (depending on a particular state's common law).[15] Dobbs, *et al.*, The Law of Torts § 699 (2d ed.). That some breach-of-fiduciary-duty remedies—e.g., damages and

Amazon has not identified a corresponding Virginia criminal statue, much less proven a violation.

[14] It is doubtful that any breach of fiduciary claim would be successful because the parties' relationships were governed by express contracts. Where, as here, the "fiduciary duty allegedly breached … existed solely because of the contractual relationship between" the parties, the plaintiff cannot "assert a valid claim for breach of fiduciary duties." *Augusta Mut. Ins. Co. v. Mason*, 645 S.E.2d 290, 295 (2007); *see also Gen. Assur. of Am., Inc. v. Overby-Seawell Co.*, 533 F. App'x 200, 207 (4th Cir. 2013) (citing *Augusta Mutual* for the proposition that "no claim for breach of fiduciary duty arises when the defendant's only obligations derive from a contractual relationship between the parties").

[15] Not a single case from Virginia is cited in this section of the treatise.

rescission—may overlap with those available in Virginia fraud cases is unsurprising. That does not expand the scope of relief available in a fraud case to the panoply of remedies potentially available for breach-of-fiduciary-duty claims. *See McClung v. Smith*, 870 F. Supp. 1384, 1399 (E.D. Va. 1994) ("The unique nature of the agency relationship … create a wide range of remedies for a principal aggrieved by an agent's breach of contract or a breach of fiduciary duty.").

Contrary to Amazon's assertions, the Virginia Supreme Court's decision in *Murray v. Hadid* illustrates Virginia's actual remedial rule for fraudulent inducement claims. 385 S.E.2d 898 (Va. 1989). There, plaintiffs brought a fraud claim concerning the defendant's misrepresentations that it would allow the plaintiffs to serve as the builders on the project if they surrendered the opportunity to buy the tract of land at issue to defendant. *Id.* at 901–02. There was no question that the defendant's misrepresentations had caused the plaintiff to act. When the plaintiff was unable to show it suffered actual damages, the Virginia Supreme Court refused to allow recovery of the amount of profits obtained by the wrongdoing defendants. *Id.* at 903–04. In doing so the Court reiterated Virginia's longstanding rule: "The usual remedy in an action for fraud is to restore the defrauded party to the position he held prior to the fraud." *Id.* at 904. "Because there was no proof that actual damages were proximately caused by [the defendants]," the plaintiffs were already "in the same position in which they were prior to the fraud," and the trial

court therefore "correctly set aside the $984,000 jury award." *Id.*; *see also Cmty. Bank v. Wright*, 267 S.E.2d 158, 160 (Va. 1980) ("there is no damage where the position of the complaining party is no worse than it would be had the alleged fraud not been committed") (quotation marks and citations omitted).

In short, Virginia law makes actual damages an element of Amazon's fraud claims. Because it failed to establish such damages by clear and convincing evidence, the district court correctly granted summary judgment on these claims.

### III. Amazon's Unjust Enrichment and Conversion Claims Fail Because Virginia Law Precludes Such Claims Where an Express Contract Covers the Same Subject Matter of the Parties' Dispute

The district court was likewise correct to reject Amazon's unjust enrichment and conversion claims. Both claims seek equitable relief (disgorgement and equitable trust) and are premised on the same conduct as Amazon's other claims— including the contract claims that Amazon has now forfeited. JA154–155 (later-dropped contract claims against Watson Defendants), JA263–67 (now-forfeited contract claims against Nelson and Kirschner), JA268–274 (unjust enrichment and conversion claims). The district court correctly recognized that Virginia law forecloses these sorts of equitable claims where, as here, valid contracts define the parties' mutual obligations.[16]

---

[16] As to Atherton, Amazon's unjust enrichment claim further fails because (1) it is barred by Virginia's three-year statute of limitations (Amazon first named Atherton as a defendant on May 6, 2022, JA3758), and (2) Amazon has failed to allege, much

Virginia law recognizes that the "'existence of an express contract covering the same subject matter of the parties' dispute precludes a claim for unjust enrichment." *James G. Davis Constr. Corp. v. FTJ, Inc.*, 841 S.E.2d 642, 647 (Va. 2020) (quoting *CGI Fed. Inc. v. FCi Fed., Inc.*, 814 S.E.2d 183 (Va. 2018)); *accord Southern Biscuit Co. v. Lloyd*, 6 S.E.2d 601, 606 (Va. 1940). This rule "is well settled" and bars an unjust enrichment claim if the plaintiff "expressly delineated the contractual obligations the two will have on the subject in question." *Raymond, Colesar, Glaspy & Huss, P.C. v. Allied Cap. Corp.*, 961 F.2d 489, 491 (4th Cir. 1992) (citing, *inter alia*, *Ellis & Myers Lumber Co. v. Hubbard*, 96 S.E. 754, 760 (Va. 1918)).

This rule is broadly endorsed and adopted by other states.[17] And the Third Restatement endorses it as well, providing that "[a] valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment." Restatement (Third) of Restitution and Unjust Enrichment § 2 (2011); *see also James G. Davis Constr.*, 841 S.E.2d at 648 (relying

---

less establish, that it conferred a benefit upon Atherton, JA3812 (Amazon stating "Nelson and Kirschner paid Atherton"). The conversion claim fails because it seeks an undefined amount of money from payments made to Atherton by his clients. JA3744, JA3813, JA3847.

[17] *See, e.g., Rivard v. Trip Mate, Inc.*, No. 22-1554, 2023 WL 2624721, at *2 (3d Cir. Mar. 24, 2023) (New Jersey and Michigan); *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 228 (3d Cir. 2022) (Pennsylvania); *Guldseth v. Fam. Med. Assocs. LLC*, 45 F.4th 526, 541 (1st Cir. 2022) (Massachusetts).

on this portion of the Restatement). The Restatement explains that courts have adopted this rule because of "[c]onsiderations of both justice and efficiency". Restatement (Third) of Restitution and Unjust Enrichment § 2 cmt. c.

The Virginia Supreme Court, like other states, has recognized just two exceptions to this rule. First, the rule does not apply if the contract "'is *invalid*, or subject to avoidance, or otherwise ineffective to regulate the parties' obligations.'" *James G. Davis Constr.*, 841 S.E.2d at 648 (emphasis added) (quoting Restatement (Third) of Restitution and Unjust Enrichment § 2 cmt. c). Second, the rule is inapplicable if the contract does not cover "'the *same subject matter* of the parties' dispute.'" *Id.* (emphasis added; quoting *CGI Fed.*, 814 S.E.2d at 190). Neither exception applies here.

As to the contracts' validity, Amazon has never disputed that it had contracts with Nelson and Kirschner (the CNIAAs) and with the Watson Defendants (the nine leases). JA1451–1459, 1460–1464, JA6495–6632; *see also* Br. 52 (arguing only that no Defendants are parties to the *amended* leases). Nor has Amazon ever argued— much less adduced facts sufficient to survive summary judgment—that these contracts were invalid. JA 662; Br. 51–54.

Rather than contest the contracts' validity, on appeal Amazon invokes the second exception, asserting—without argument or citation to the record—that the parties' contracts do not "'cover[] the same subject matter'" as its unjust enrichment

claims. Br. 51–52 (quoting *James G. Davis Constr.*, 841 S.E.2d at 647). Amazon does not explain what it thinks "subject matter" means in this context, but it is clear "that 'subject matter' … must reach more broadly than a contract's express terms"— a conclusion, the Third Circuit has noted, that "existing case law confirms." *Rivard*, 2023 WL 2624721, at *2 (applying rule under New Jersey and Michigan law). Certainly, for example, a contract can preclude an unjust enrichment claim even if the defendant is not ultimately liable under the contract. Indeed, one of the Restatement's two illustrations of this rule explicitly contemplates such an outcome. Restatement (Third) of Restitution and Unjust Enrichment § 2 cmt. c, illus. 4.

Ultimately, courts evaluate whether a contract covers the same "subject matter" as an unjust enrichment claim in light of the fundamental reason for this rule—which is "is to prohibit a party whose expectations were not realized under the contract from nevertheless recovering outside the contract." *Utility Audit, Inc. v. Horace Mann Service Corp.*, 383 F.3d 683, 689 (7th Cir. 2004) (applying Illinois law). Accordingly, "what's important is whether the agreement covered the *general scope of the business relationship* at issue and whether it was the *sort of thing that might have been accounted for in the contract*." *Associated Banc-Corp v. John H. Harland Co.*, 2007 WL 128337, at *1 (E.D. Wis. Jan. 11, 2007) (emphasis added) (applying Wisconsin law).

The Virginia Supreme Court's decision in *James G. Davis Construction* aptly illustrates when an unjust enrichment claim will lie outside the subject matter of the contract. There the contract was a "joint check agreement" that specified "*how* [a supplier] would be paid for the materials it shipped to" a construction site. 841 S.E.2d at 645 (emphasis added). The subcontractor dropped off the project, and the supplier later invoiced the general contractor for materials it delivered to the site; after the general contractor refused to pay, the supplier sued the general contractor for unjust enrichment. *Id.* at 646–47. The Court held that the contract did not cover the subject matter of the unjust enrichment claim because the contract expressly "state[d] that its 'sole purpose' '[wa]s to assist Subcontractor in making payment to Supplier'" and "further state[d] that '[n]othing contained in this Agreement is intended by the parties to create *any contractual relationship or equitable obligation* between [the general contractor] and Supplier." *Id.* at 648 (emphasis added; penultimate brackets in original).

The contracts here, in contrast, define the entirety of the parties' relationships and mutual obligations. Consider first Nelson's and Kirschner's CNIAAs, which Amazon fails to address and which cover the same subject matter as Amazon's unjust enrichment claims—as Amazon's own arguments make clear. Amazon's breach-of-contract claims against Nelson and Kirschner were premised on *the very same conduct* as its unjust enrichment claims—namely, Nelson's and Kirschner's

44

receipt of alleged "kickbacks" in connection with Amazon's real estate transactions. In its summary judgment brief, for example, Amazon argued that Nelson and Kirschner violated the CNIAAs' non-compete provisions by "enter[ing] into agreements to receive kickback payments linked to *Amazon deals*." JA658 (emphasis in original). And in Amazon's operative complaint the "unjust benefit" underlying the unjust enrichment claim was "millions in unjustified payments (Watson and the Northstar Defendants) or kickbacks (Nelson and Kirschner)" Defendants allegedly received "because Plaintiffs were induced to enter into the lease agreements." JA 268–269.

These CNIAAs plainly cover the "general scope of the business relationship" between Amazon and Nelson and Kirschner," and the no-kickback duties Amazon asserts are obviously "the sort of thing that might have been accounted for in the contract." *Associated Banc-Corp*, 2007 WL 128337, at *1. After all, Amazon itself argued in this litigation that the *existing* CNIAAs prohibited this conduct. There was nothing preventing Amazon from including in the CNIAAs express provisions prohibiting Nelson and Kirschner from accepting referral fees on Amazon-related transactions. There is therefore no reason to retroactively enlarge Amazon's rights under the contract *Amazon itself drafted* by imposing this provision as a matter of unjust enrichment. As this Court has observed, "'[p]arties to an express contract are entitled to have their rights and duties adjudicated exclusively by its terms.'"

*Raymond, Colesar, Glaspy & Huss, P.C. v. Allied Cap. Corp.*, 961 F.2d 489, 491 (4th Cir. 1992) (quoting *Vollmar v. CSX Transportation, Inc.*, 705 F.Supp. 1154, 1176 (E.D. Va. 1989), *aff'd*, 898 F.2d 413 (4th Cir. 1990)).

Similarly, Amazon's lease agreements cover the same subject matter as Amazon's unjust enrichment claims against the Watson Defendants. Amazon sued the Watson Defendants *based on the contracts it had with them*. Its original complaint noted that Amazon "executed contracts with [the Watson Defendants] stating, among other things, that Defendants did not have any third party broker, finder, or similar referral contracts or arrangements in relation to the [lease transactions] …." JA155. Amazon claimed that the Watson Defendants breached these provisions by "execut[ing] 'referral' agreements as part of the kickback scheme," *id.*, which is the very same conduct underlying Amazon's unjust enrichment claim, *see* JA268–269.

*James G. Davis Construction* further confirms that the leases pertain to the same "subject matter" as Amazon's unjust enrichment claims against the Watson Defendants. That decision indicates that a contract will pertain to *different* subject matter "'where the benefit [the defendant unjustly] received was outside the scope of the contract.'" 841 S.E.2d at 648 (quoting *Clapp v. Goffstown Sch. Dist.*, 977 A.2d 1021, 1025 (N.H. 2009)). Here, in contrast, Amazon premises its unjust enrichment

claim against the Watson Defendants on just one "benefit"—the money the Watson Defendants received *under the leases.* Br. 7; JA268–269.

In sum, where "the parties have bargained for certain benefits, it makes no sense to resort to anything other than the bargain initially struck, or else the disappointed party could obtain benefits after the fact that he was unable to obtain during negotiations." *Associated Banc-Corp*, 2007 WL 128337, at *1. That is precisely what Amazon is trying to do here. This Court should reject those efforts.

Rather than confront these points, Amazon invokes this Court's earlier decision in an appeal from a preliminary injunction issued against the Watson Defendants. Br. 51–54 (citing *Amazon.com, Inc. v. WDC Holdings LLC* ("*Amazon I*"), 2021 WL 3878403 (4th Cir. Aug. 31, 2021)). That decision does not require ruling in Amazon's favor now. It addressed a different set of parties, standard, operative complaint, and factual record. *See Graves v. Lioi*, 930 F.3d 307, 318 (4th Cir. 2019) (the law-of-the-case doctrine "poses no bar to the assessment of past holdings based on a different procedural posture when, as is the case in the progression from review of a motion to dismiss to a motion for summary judgment, that later review expands the court's inquiry based on development of actual facts").

The Watson Defendants were the only parties to the preliminary injunction appeal. This Court therefore had no occasion to address whether Nelson's and Kirschner's CNIAAs foreclosed Amazon's unjust enrichment claims against them.

It is "easy to reject a law-of-the-case argument" where, as here, "the differences in the parties' positions generate different issues, so that a ruling with respect to one party's issue does not resolve another party's different issue"—and it is an equally "simple proposition" that "a party joined in an action after a ruling has been made should be free to reargue the matter without the constraints of law-of-the-case analysis." 18B Wright, Miller & Cooper, Fed. Prac. & Proc. § 4478.5 (3d ed.) (collecting cases) (footnotes omitted).

Further, this Court's preliminary injunction decision simply held that because "Northstar has questioned its amenability to suit under the contracts governing the lease agreements," Amazon could plead "unjust enrichment in the alternative." *Amazon I*, 2021 WL 3878403, at *6. By the time of the summary judgment ruling, it was clear that the Watson Defendants would *not* contest the validity of the leases; they had no reason to, since by that point Amazon had amended its complaint to *drop* its breach-of-contract claim against the Watson Defendants. *Compare* JA154–155 *with* JA235–274. Regardless, at summary judgment Amazon needed to do more than "'plead equitable theories.'" *Amazon I*, 2021 WL 3878403, at *6 (quoting *Mendoza v. Cederquist*, 2009 WL 1254669, at *3 (E.D. Va. May 6, 2009)). Amazon needed to demonstrate that a jury could reasonably find in its favor on every element of its claims for equitable relief. Because it failed to do so, the district court properly granted summary judgment on these claims.

Finally, Amazon's conversion claims are simply repackaged versions of its unjust enrichment claims and therefore fail for the same reason: Amazon's contracts with the Defendants set out the parties' mutual obligations, and Amazon cannot use tort law to retroactively amend those contracts. *See, e.g., Condo. Servs., Inc. v. First Owners' Ass'n of Forty Six Hundred Condo., Inc.*, 709 S.E.2d 163, 171 (Va. 2011) (holding that "[t]o recover for the tort of conversion," the plaintiff cannot rely on a duty "'existing between the parties solely by virtue of the contract.'" (quoting *Dunn Constr. Co. v. Cloney*, 682 S.E.2d 943, 946 (Va. 2009)). Amazon cannot evade the preclusive effect of the parties' contracts simply by affixing a different label to its unjust enrichment theory.

Amazon's conversion claims fail for a further, independently sufficient reason: Amazon has failed to show that its conversion claim entitles it to disgorgement or an equitable trust (the only relief it seeks on this claim). As the district court noted, damages—not equitable relief—are the typical remedy for conversion claims in Virginia. JA3745 (citing *Straley v. Fisher*, 10 S.E.2d 551, 552 (Va. 1940); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 2011 WL 4625760, at *2 (E.D. Va. Oct. 3, 2011)). In *Straley*, the Virginia Supreme Court held that for conversion claims "the measure of damages, as a general rule, is the *value of the property converted* at the time and the place of conversion," and "profits dependent upon conjectural, speculative or estimated future bargains *are not subject to*

*recovery*." 10 S.E.2d at 553 (emphasis added). Amazon failed to address *Straley* before the district court, and it fails to do so again on appeal. Nor has Amazon cited *any* Virginia case authorizing courts to award disgorgement or equitable trusts on conversion claims.[18]

Regardless, even if Virginia law were to authorize restitutionary relief for conversion claims in some instances, Amazon would need to show the predicate necessary for any equitable relief—that it lacks an adequate remedy at law. *See, e.g., Wilderness Med. Ass'n, Inc. v. Nat'l Ass'n for Search & Rescue*, 1994 WL 1031397, at *2 (Va. Cir. Ct. Oct. 25, 1994) ("A court will not award equitable relief where an adequate remedy exists at law."). Amazon, however, did not even *allege* in its complaint that its conversion claim lacked an adequate remedy at law. JA272–274. Nor did its summary judgment brief establish this point. Citing just two Virginia-law cases—neither of which involved conversion claims—Amazon insisted that its legal remedies were categorically inadequate because "the defendant may be unable to pay a claim." JA663 (citing *Jones v. Harrison*, 458 S.E.2d 766, 769 (Va. 1995); *Faulknier v. Shafer*, 563 S.E.2d 755, 758–59 (Va. 2002)). Yet Amazon never specified which defendant it thinks is insolvent, much less adduced evidence to

---

[18] This Court's opinion in *Amazon I* did not address this question. *See* 2021 WL 3878403, at *6.

establish insolvency. And on appeal Amazon again leaves this point unaddressed. Indeed, its brief does not specifically address the conversion claim at all. Br. 47–54.

A plaintiff seeking equitable relief must establish the necessary elements (including the inadequacy of legal remedy) in accordance with the applicable evidentiary burden at each stage of the proceeding. Because Amazon has failed to so, Defendants are entitled to summary judgment. *See, e.g., Young-Allen v. Bank of Am., N.A.*, 839 S.E.2d 897, 901 (Va. 2020) (sustaining demurrer as to equitable rescission claim because the "complaint failed to plead facts to support the drastic remedy of equitable rescission"); *LMP Holdings, LLC v. PLY Enterprises, LLC*, 2012 WL 4344302, at *5 (E.D. Va. Sept. 21, 2012) ("[A] complaint failing to allege that there is no adequate remedy at law is fatally deficient.").

## IV. Amazon's Civil Conspiracy Claim Against Atherton Fails Because Virginia Law Prohibits Holding an Agent Liable for Conspiring with Its Principal

The district court also correctly granted summary judgment in favor of Atherton on Amazon's conspiracy claim. As the Virginia Supreme Court has determined, when one party to an alleged conspiracy is acting in his capacity as an agent of the other party to the conspiracy, the parties are a single entity, and a single entity cannot conspire with itself. *See Fox v. Deese*, 362 S.E.2d 699, 708 (Va. 1987) (cited in *Prousalis v. Jamgochian*, 38 F. App'x 903, 905 (4th Cir. 2002)); *Perk v. Vector Res. Group,*, 485 S.E.2d 140, 144 (Va. 1997). This Court has long recognized

this doctrine, sometimes known as the "intra-corporate immunity doctrine." *See, e.g., Buschi v. Kirven,* 775 F.2d 1240, 1251–52 (4th Cir. 1985).

This doctrine bars Amazon's conspiracy claim as to Atherton, because the alleged conduct underlying its claim concerns Atherton's conduct *as an attorney*. *See* JA374 ("[I]t is undisputed that Defendant Atherton was acting in a representative capacity when he created corporate entities and trusts for the benefit of Nelson and Casey Kirschner."). Because an attorney is the client's agent, Atherton "could not have conspired" with his clients. *Michigan Mut. Ins. Co. v. Smoot*, 129 F. Supp. 2d 912, 923 (E.D. Va. 2000); *see also Fox*, 362 S.E.2d at 708; *Smith v. Purnell*, 2011 WL 6140868, at *7 (E.D. Va. Dec. 9, 2011) ("The rule that agents cannot conspire with their principals has been applied to allegations that an attorney conspired with his client[.]"), *aff'd*, 475 Fed. App'x. 464 (4th Cir. 2012).

Now, for the first time on appeal, Amazon objects to applying the intra-corporate immunity doctrine here. Amazon's summary judgment brief did not use the terms "principal," "agent," or "attorney" its discussion of the conspiracy claims. JA660–JA661. *Compare* D.E. 1173 at 24-26 *with* JA660, JA661. Amazon has thus forfeited this argument. "[I]ssues that were not raised in the district court will not be addressed on appeal." *Holland v. Big River Minerals Corp.,* 181 F.3d 597, 605 (4th Cir. 1999). As the district court held, "Plaintiffs do not contest this point, thus conceding it." JA3742.

Further, even if Amazon were not barred from disputing this point, its arguments are meritless. Its argument that Atherton acted "outside the scope" of his principal-agent relationship is a thinly veiled attempt to have this Court adopt an "ultra vires" exception to the intra-corporate immunity doctrine. Yet Amazon cites no applicable authority in support of such an exception. Nor could it: Neither this Court nor the Virginia Supreme Court has adopted such an exception. *See, e.g.*, *Saleh v. Va. State Univ.*, 1999 WL 34798179, at *20–21 (E.D. Va. Feb. 25, 1999), *aff'd sub nom. Saleh v. Upadhyay*, 11 F. App'x 241 (4th Cir. 2001).

Even if the Court were to adopt the exception, it would not apply here. If every allegation of unlawful action were sufficient to deem activity "outside the scope" of authority, then most if not all claims involving a principal and an agent would state a conspiracy claim. *See, e.g., Huntingdon Life Sciences, Inc. v. Rokke,* 986 F. Supp. 982, 991 (E.D. Va. 1997) ("a [principal] acting through its [agent], even where the act is unlawful, does not constitute a 'conspiracy.'").

Moreover, Amazon's argument that Atherton represented less than all alleged conspirators is precluded not only by its failure to raise the issue below, but also by its own pleadings and discovery. The *only* Atherton conduct identified in Amazon's discovery responses concerned his representation of Nelson and Kirschner. *See* JA324, JA326–JA327. Because the intra-corporate immunity doctrine provides that

this conduct cannot constitute a conspiracy, Amazon cannot point to *anyone* with whom Atherton "conspired."

Finally, as noted, Amazon showed *no* damages, and its claim also fails for that reason. *Gallop v. Sharp,* 19 S.E.2d 84, 86 (Va. 1942); Va. Code § 18.2-500(a).

## CONCLUSION

For these reasons, this Court should affirm the decision below.

Respectfully submitted,

Dated: February 9, 2024

s/ Kian J. Hudson

Stanley L. Garnett
Sara R. Bodner
GARNETT POWELL MAXIMON BARLOW
900 Arapahoe Ave.
Boulder, CO 80302
(303) 991-3344

George R. Calhoun
IFRAH PLLC
1770 Pennsylvania Ave., NW
Suite 650
Washington, DC 20006
(202) 524-4147
*Counsel for Brian Watson, WDC Holdings LLC, Sterling NCP FF, LLC, Manassas NCP FF, LLC, and NSIPI Administrative Manager*

Julie S. Palmer
Alison W. Feehan
HARMAN, CLAYTOR, CORRIGAN, & WELLMAN
P.O. Box 70280
Richmond, VA 23255
(804) 747-5200
*Counsel for Rodney Atherton*

Kian J. Hudson
BARNES & THORNBURG LLP
11 S Meridian St.
Indianapolis, IN 46204
(317) 229-3111

J.D. Thomas
BARNES & THORNBURG LLP
827 19th Ave. South, Suite 930
Nashville, TN 37203
(615) 621-6011
*Counsel for Casey Kirschner*

Alex Little
BURR & FORMAN, LLP
222 Second Ave. South, Suite 2000
Nashville, TN 37201
(615) 724-3200

Adam Smart
BURR & FORMAN, LLP
50 North Laura St., Suite 3000
Jacksonville, FL 32801
(904) 232-7200

*Counsel for Carleton Nelson and Cheshire Ventures LLC*

## STATEMENT REGARDING ORAL ARGUMENT

This appeal largely involves straightforward legal issues, most of which arise under state law. In Defendants' view, oral argument is therefore unnecessary. That said, Defendants would be pleased to present oral argument if the Court believes such argument would be of assistance to its resolution of this appeal.

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limits set forth in Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 12,998 words. This brief complies with the typeface and style requirements because it has been prepared in a proportionally spaced typeface in 14-point Times New Roman font.

/s Kian J. Hudson

Kian J. Hudson
BARNES & THORNBURG LLP
11 S Meridian St.
Indianapolis, IN 46204
(317) 229-3111
kian.hudson@btlaw.com