No. 23-1991

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT
_____

AMAZON.COM, INC.; AMAZON DATA SERVICES, INC.,

*Plaintiffs-Appellants*,

v.

WDC HOLDINGS LLC, d/b/a Northstar Commercial Partners; BRIAN
WATSON; STERLING NCP FF, LLC; MANASSAS NCP FF, LLC; NSIPI
ADMINISTRATIVE MANAGER; CARLETON NELSON; CASEY
KIRSCHNER; CHESHIRE VENTURES LLC; RODNEY ATHERTON,

*Defendants-Appellees*,

and

RENRETS LLC; NOVA WPC LLC; WHITE PEAKS CAPITAL LLC;
VILLANOVA TRUST; ALLCORE DEVELOPMENT LLC; FINBRIT
HOLDINGS LLC; 2010 IRREVOCABLE TRUST; SIGMA REGENERATIVE
SOLUTIONS LLC; CTBSRM, INC.; DEMETRIUS VON LACEY,

*Defendants*.

_____

On Appeal from the United States District Court
for the Eastern District of Virginia, No. 1:20-cv-484-RA

_____

**Opening Brief of Appellants Amazon.com, Inc. & Amazon Data Services, Inc.**

_____

Thomas G. Hungar
 *Counsel of Record*
David Debold
Patrick F. Stokes
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500

*Counsel for Plaintiffs-Appellants | Additional Counsel in Signature Block*

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26 and Local Rule 26.1, Plaintiff-Appellant Amazon.com, Inc. states that it is a publicly traded corporation that does not have any parent corporation.  Amazon.com, Inc. is not aware of any entity that owns 10% or more of its publicly traded stock.  Plaintiff-Appellant Amazon Data Services, Inc. is a wholly-owned direct subsidiary of Amazon.com, Inc.  Neither Appellant is a trade association and no other publicly traded corporation or publicly held entity has any direct financial interest in the outcome of this litigation.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................v

INTRODUCTION ....................................................................................1

JURISDICTIONAL STATEMENT .........................................................4

ISSUES ON APPEAL ..............................................................................4

STATEMENT OF THE CASE ..................................................................5

    I.    Factual Background ......................................................................5

        A.   Nelson and Kirschner had critical gatekeeping responsibilities at Amazon ....................................................5

        B.   Nelson and Kirschner exploited their Amazon positions to steer deals in exchange for kickbacks .............................6

        C.   Nelson and both Kirschners conspired with Atherton and Watson to conceal their illegal scheme .................................8

        D.   Defendants inflated Amazon's costs to fund the kickbacks ................9

        E.   Atherton created a web of sham entities to hide the kickbacks ..........11

        F.   Nelson, Kirschner, and Atherton expanded the enterprise to additional deals with more kickbacks .................................11

        G.   Defendants richly profited ...............................................14

        H.   Amazon learned of the scheme and took corrective action ...............14

    II.   Procedural History .....................................................................15

STANDARD OF REVIEW ......................................................................17

SUMMARY OF ARGUMENT .................................................................17

ARGUMENT ...........................................................................................20

    I.    Amazon Suffered Injury And Has Recoverable Damages Under Its RICO And Fraud Claims .................................................20

A.  Amazon is harmed and can recover RICO damages in the amount of the kickbacks paid ............................................................ 20

B.  Amazon is harmed and can recover state-law fraud damages in the amount of the kickbacks paid ........................................ 31

II.  The Record Supports A Finding That Defendants Formed A Racketeering Enterprise ............................................................... 37

A.  The evidence of enterprise is sufficient to require a trial .................. 37

B.  One need not be an enterprise member to be liable under RICO ....... 46

III.  Amazon's Equitable Claims Were Erroneously Dismissed ...................... 47

A.  The court's ruling was premature ........................................................ 47

B.  Amazon is entitled to equitable remedies because Defendants' unlawful gains exceed Amazon's direct damages ............................. 49

C.  Neither the original lease agreements nor the amended leases preclude Amazon's unjust enrichment claim ...................................... 51

IV.  Atherton Is Not Immune From Conspiracy Liability ................................ 54

CONCLUSION ........................................................................................................ 58

REQUEST FOR ORAL ARGUMENT ................................................................... 59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amazon.com, Inc. v. WDC Holdings, LLC,*
2021 WL 3878403 (4th Cir. Aug. 31, 2021) ............. 2, 15, 48, 50, 51, 52, 53, 54

*AmTruck Factors v. Int'l Forest Prods.,*
795 P.2d 742 (Wash. Ct. App. 1990)............................................................32, 35

*Baehr v. Creig Northrop Team, P.C.,*
953 F.3d 244 (4th Cir. 2020) ......................................................................22, 23

*Blackburn v. A.C. Israel Enters.,*
2023 WL 4710884 (E.D. Va. July 24, 2023)......................................................55

*Bolling v. King Coal Theatres,*
41 S.E.2d 59 (Va. 1947) ...................................................................................49

*Bowman v. State Bank of Keysville,*
331 S.E.2d 797 (Va. 1985) ...............................................................................55

*Boyle v. United States,*
556 U.S. 938 (2009)...................................................................18, 37, 38, 39, 41

*Bridge v. Phx. Bond & Indem. Co.,*
553 U.S. 639 (2008)..........................................................................................20

*Byrd v. Crosstate Mortg. & Invs., Inc.,*
34 Va. Cir. 17 (1994) .......................................................................................32

*Cap. Lighting & Supply, LLC v. Wirtz,*
2018 WL 3970469 (D. Md. Aug. 20, 2018) ......................................................45

*CGI Fed. Inc. v. FCi Fed., Inc.,*
814 S.E.2d 183 (Va. 2018) ...............................................................................52

*Charles E. Brauer Co. v. NationsBank of Va., N.A.,*
466 S.E.2d 382 (Va. 1996) ..........................................................................55, 56

*City of New York v. Citisource, Inc.,*
679 F. Supp. 393 (S.D.N.Y. 1988) ...................................................................22

*Companion Prop. & Cas. Ins. Co. v. U.S. Bank Nat'l Assoc.*,
2016 WL 3452734 (D.S.C. June 24, 2016) ......................................30

*Compassionate Care Pediatrics, LLC v. Child.'s Med. Ctr., Ltd.*,
100 Va. Cir. 6 (2018) .......................................................................57

*Cont'l Mgmt., Inc. v. United States*,
527 F.2d 613 (Ct. Cl. 1975) .......................................................21, 32

*Curiale v. Capolino*,
883 F. Supp. 941 (S.D.N.Y. 1995) ..................................................24

*CVLR Performance Horses, Inc. v. Wynne*,
524 F. App'x 924 (4th Cir. 2013) ....................................................44

*Dickson v. Microsoft Corp.*,
309 F.3d 193 (4th Cir. 2002) .....................................................39, 45

*Dolan v. JetBlue Airways Corp.*,
385 F. Supp. 3d 1338 (S.D. Fla. 2019) ............................................22

*Donaldson  v. Primary Residential Mortg., Inc.*,
2020 WL 3184089 (D. Md. June 12, 2020) .....................................45

*Donemar, Inc. v. Molloy*,
169 N.E. 610 (N.Y. 1930) ..........................................................32, 34

*ePlus Tech., Inc. v. Aboud*,
313 F.3d 166 (4th Cir. 2002) .....................................................43, 44

*Faulknier v. Shafer*,
563 S.E.2d 755 (Va. 2002) ...............................................................50

*Flyers Rights Educ. Fund, Inc. v. FAA*,
864 F.3d 738 (D.C. Cir. 2017) .........................................................36

*Folmar v. Harris*,
650 F. App'x 818 (4th Cir. 2016) ....................................................35

*Fox v. Deese*,
362 S.E.2d 699 (Va. 1987) .........................................54, 55, 56, 57

*Gussin v. Shockey*,
    933 F.2d 1001 (4th Cir. 1991) ............................................................33

*Gussin v. Shockey*,
    725 F. Supp. 271 (D. Md. 1989) .........................................................33

*Hayes v. Delbert Servs. Corp.*,
    811 F.3d 666 (4th Cir. 2016) .............................................................58

*Hellenic Lines, Ltd. v. O'Hearn*,
    523 F. Supp. 244 (S.D.N.Y. 1981) .....................................................22

*Hino Motors Mfg. U.S.A. Inc. v. Hetman*,
    2022 WL 16709717 (E.D. Mich. Aug. 4, 2022) ................................22

*Homeland Training Ctr., LLC v. Summit Point Auto. Rsch. Ctr.*,
    594 F.3d 285 (4th Cir. 2010) .........................................................48, 49

*ImmunoGen, Inc. v. Hirshfeld*,
    2022 WL 885774 (Fed. Cir. Mar. 25, 2022) .....................................31

*Integrated Direct Mktg., LLC v. May*,
    129 F. Supp. 3d 336 (E.D. Va. 2015) ................................................30

*James G. Davis Constr. Corp. v. FTJ, Inc.*,
    841 S.E.2d 642 (Va. 2020) ................................................................51

*Jones v. Harrison*,
    458 S.E.2d 766 (Va. 1995) ................................................................50

*Kamen v. Kemper Fin. Servs., Inc.*,
    500 U.S. 90 (1991) ............................................................................37

*Kewaunee Sci. Corp. v. Pegram*,
    503 S.E.2d 417 (N.C. Ct. App. 1998) ...........................................32, 34

*Kinzbach Tool Co. v. Corbett-Wallace Corp.*,
    160 S.W.2d 509 (Tex. 1942) .........................................................33, 34

*Klaiber v. Freemason Assocs., Inc.*,
    587 S.E.2d 555 (Va. 2003) ...........................................................34, 35

vii

*Liquid Air Corp. v. Rogers*,
  834 F.2d 1297 (7th Cir. 1987) ...................................................................44

*Long & Foster Real Estate, Inc. v. Clay*,
  343 S.E.2d 297 (Va. 1986) ........................................................................35

*Marlboro v. Scannapieco*,
  545 F. Supp. 2d 452 (D.N.J. 2008) .......................................................24

*Massey v. Va. Polytechnic Inst. & State Univ.*,
  75 F.4th 407 (4th Cir. 2023) ...................................................................36

*McDonald v. Robinson*,
  2020 WL 10456846 (E.D. Va. Sept. 4, 2020) ....................................46

*Millboro Lumber Co. v. Augusta Wood Prods. Corp.*,
  125 S.E. 306 (Va. 1924) ............................................................................32

*Morley v. Cohen*,
  888 F.2d 1006 (4th Cir. 1989) ................................................................28

*Nahigian v. Juno-Loudon, LLC*,
  2010 WL 3418179 (E.D. Va. Aug. 23, 2010) ....................................34

*Nat'l Org. for Women, Inc. v. Scheidler*,
  510 U.S. 249 (1994)....................................................................................38

*Nelson-Salabes, Inc. v. Morningside Dev., LLC*,
  284 F.3d 505 (4th Cir. 2002) ...............................................................30

*Nifong v. SOC, LLC*,
  234 F. Supp. 3d 739 (E.D. Va. 2017) ..................................................30

*Patel v. Anand, LLC*,
  564 S.E.2d 140 (Va. 2002) .......................................................................35

*Perk v. Vector Res. Group, Ltd.*,
  485 S.E.2d 140 (Va. 1997) .......................................................................55

*Phillips Chem. Co. v. Morgan*,
  440 So.2d 1292 (Fla. Dist. Ct. App. 1983) .......................................33

*PJS Assocs., L.P. v. Cosby*,
    2000 WL 1618100 (Va. Cir. Ct. Oct. 26, 2000) ..................................................56

*Potomac Elec. Power Co. v. Elec. Motor and Supply, Inc.*,
    262 F.3d 260 (4th Cir. 2001) .....................................................................20, 31

*Prospect Dev. Co., Inc. v. Bershader*,
    515 S.E.2d 291 (Va. 1999) ...........................................................................34

*S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*,
    318 F.3d 592 (4th Cir. 2003) .......................................................................29

*S.C. Johnson & Son, Inc. v. Transp. Corp. of Am., Inc.*,
    697 F.3d 544 (7th Cir. 2012) .......................................................................22

*Salinas v. United States*,
    522 U.S. 52 (1997).............................................................................39, 46, 47

*Seabulk Offshore, Ltd. v. Am. Home Assurance Co.*,
    377 F.3d 408 (4th Cir. 2004) .......................................................................17

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479 (1985).....................................................................................20

*Sempowich v. Tactile Sys. Tech., Inc.*,
    19 F.4th 643 (4th Cir. 2021) .......................................................................17

*Sharma v. USA Int'l, LLC*,
    851 F.3d 308 (4th Cir. 2017) .......................................................................35

*Silicon Knights, Inc. v. Epic Games, Inc.*,
    2012 WL 1596722 (E.D.N.C. May 7, 2012) ...............................................29

*Skilling v. United States*,
    561 U.S. 358 (2010).....................................................................................23

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016).....................................................................................23

*Templeton v. Jarmillo*,
    28 F.4th 618 (5th Cir. 2022) .......................................................................36

*Treads USA, LLC v. Boyd LP I*,
   2010 WL 2711266 (W.D. Va. May 4, 2010) .................................................55

*Uniroyal Goodrich Tire Co. v. Mut. Trading Corp.*,
   63 F.3d 516 (7th Cir. 1995) ...............................................................45

*United Roasters, Inc. v. Colgate-Palmolive Co.*,
   649 F.2d 985 (4th Cir. 1981) ..............................................................49

*United States v. Bush*,
   626 F.3d 527 (9th Cir. 2010) ..............................................................57

*United States v. Carter*,
   217 U.S. 286 (1910)............................................................................33

*United States v. Christensen*,
   828 F.3d 763 (9th Cir. 2015) ..............................................................46

*United States v. Cornell*,
   780 F.3d 616 (4th Cir. 2015) ..............................................................46

*United States v. Cottone*,
   928 F.2d 400 (4th Cir. 1991) ......................................................41, 43

*United States v. Elliott*,
   571 F.2d 880 (5th Cir. 1978) ......................................................37, 39

*United States v. Farrell*,
   921 F.3d 116 (4th Cir. 2019) ..............................................................57

*United States v. Fattah*,
   914 F.3d 112 (3d Cir. 2019) ...............................................................40

*United States v. Fiel*,
   35 F.3d 997 (4th Cir. 1994) ........................................................39, 41

*United States v. Griffin*,
   660 F.2d 996 (4th Cir. 1981) ..............................................................38

*United States v. Gross*,
   199 F. App'x 219 (4th Cir. 2006) .......................................................40

*United States v. Mathis*,
　932 F.3d 242 (4th Cir. 2019) ...............................................................40

*United States v. Pinson*,
　860 F.3d 152 (4th Cir. 2017) ...............................................................43

*United States v. Pratt*,
　915 F.3d 266 (4th Cir. 2019) ........................................................35, 57

*United States v. Stodola*,
　953 F.2d 266 (7th Cir. 1992) ...............................................................44

*United States v. Tillett*,
　763 F.2d 628 (4th Cir. 1985) ........................................39, 40, 41, 43, 46

*United States v. Turkette*,
　452 U.S. 576 (1981) ............................................................................38

*United States v. Williams*,
　504 U.S. 36 (1992) .......................................................................35, 36

*Volvo Trademark Holding Aktiebolaget v. Clark Mach. Co.*,
　510 F.3d 474 (4th Cir. 2007) ...............................................................53

*West Virginia v. Moore*,
　895 F. Supp. 864 (S.D.W. Va. 1995) ...............................................23, 24

*Western Contracting Corp. v. Bechtel Corp.*,
　882 F.2d 1196 (4th Cir. 1989) ......................................................33, 34

*Williams Elecs. Games, Inc. v. Garrity*,
　366 F.3d 569 (7th Cir. 2004) ......................................................21, 48

**Statutes**

18 U.S.C. § 1961 ................................................................................37

18 U.S.C. § 1962 ......................................................4, 37, 39, 46, 47

18 U.S.C. § 1964 ........................................................................17, 20

28 U.S.C. § 1292 .................................................................................4

28 U.S.C. § 1331 .................................................................................4

28 U.S.C. § 1367 ............................................................................4

Organized Crime Control Act of 1970,
   Pub. L. No. 91-452, 84 Stat. 947 .........................................20

**Rules**

Fed. R. Civ. P. 56 ........................................................................17

Fed. R. Civ. P. 83 ........................................................................31

E.D. Va. Loc. Civ. R. 56 ............................................................30

**Other Authorities**

25 Am. Jur. 2d Election of Remedies § 13 ...............................49

27A Am. Jur. 2d Equity § 81 .....................................................49

2 Dobbs, Law of Remedies (2d ed. 1993) ...................21, 32, 48

3 Dobbs, Law of Torts (2d ed. 2011)....................................32, 35

Model Rules of Prof'l Conduct r. 1.2(d) (Am. Bar Ass'n 2023)............................56

Restatement (First) Restitution (1937) ......................................50

Restatement of Employment Law (2015)..................................23

Restatement (Third) of Restitution and Unjust Enrichment (2011) ......................51

# INTRODUCTION

This appeal involves employees who defrauded their employer by accepting millions in bribes in exchange for steering real-estate development projects to favored parties. The principal issue is whether civil Racketeer Influenced and Corrupt Organizations (RICO) and fraud plaintiffs may recover damages on grounds other than that the project price exceeded a market rate.

For more than two years, defendants Carleton Nelson and Casey Kirschner used their positions as Amazon employees to obtain nearly $10 million in kickbacks for themselves and co-conspirators in exchange for arranging lucrative Amazon-funded real-estate transactions for favored developers, including defendants Brian Watson and his company, Northstar. Nelson and Kirschner relied on a co-conspirator attorney, Rod Atherton, to launder the kickbacks and conceal the scheme. Defendants avoided detection by calibrating the kickback amounts so that the overall contract prices would not arouse suspicion. The scheme would have continued indefinitely had Amazon not been alerted to it.

The evidence of this pay-to-play scheme is overwhelming. It is documented by bank records, corporate documents, recorded conversations admitting to the scheme, an FBI confession Kirschner signed (JA2973-2976), and participants' testimony. Based on just a fraction of that evidence, this Court affirmed Judge

O'Grady's conclusion that Amazon is "likely to prevail on the merits." *Amazon.com, Inc. v. WDC Holdings, LLC*, 2021 WL 3878403, at *8 (4th Cir. Aug. 31, 2021) (affirming preliminary injunction).

Despite this overwhelming evidence, Judge Alston (to whom the case was reassigned) granted Defendants summary judgment on Amazon's RICO, state-law fraud, unjust enrichment, and conversion claims, and also granted summary judgment to Atherton, the corrupt attorney, on Amazon's sole remaining claim against him (civil conspiracy). The district court did so even while recognizing "a reasonable juror could conclude that the Watson Defendants" "depriv[ed] Amazon of its employees' honest services" "by bribing them." JA3733.

The district court reached this result by misapplying the law. It ruled that Amazon had no cognizable RICO or fraud damages unless it proved it paid more than "fair market value" for the bespoke data center development projects procured through kickbacks. But decades of caselaw holds that, when an employee takes kickbacks from his employer's suppliers, the employer suffers an injury and can recover the kickback amount in damages because it is built into the employer's costs. Moreover, while Amazon needs to demonstrate only a genuine dispute of facts, the record here unambiguously establishes that Defendants increased the amounts Amazon paid on the contracts specifically to fund the kickbacks.

The district court also erred by applying conspiracy caselaw rather than RICO precedents in ruling that Amazon could not prove a RICO enterprise. The record here shows that multiple enterprise members—Nelson, Kirschner, and Atherton—interacted with one another and with other Defendants in *every* fraudulent deal. The enterprise element is not defeated merely because other defendants participated in only some predicate acts or interacted only with some other members. Moreover, one need not be an enterprise member to violate RICO.

The district court next erred in rejecting Amazon's equitable claims merely because Amazon may have a legal remedy. While plaintiffs may not obtain a double recovery in law and equity, the *possibility* of recovering damages is no bar to pursuing equitable claims at trial. The adequacy or inadequacy of Amazon's legal relief can be assessed only after trial. Moreover, the district court's rejection of Amazon's equitable claims violated this Court's mandate.

Finally, the district court erred in excusing Atherton from any liability based on the rule that an agent cannot conspire with his principal. Atherton's alleged agency is a contested factual issue, and he conspired with third parties with whom he has never alleged any agency relationship.

The district court's judgment should be reversed.

**JURISDICTIONAL STATEMENT**

The district court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 over Amazon's RICO claim, 18 U.S.C. § 1962, and supplemental jurisdiction over Amazon's state-law claims. 28 U.S.C. § 1367(a).

This Court has jurisdiction under 28 U.S.C. § 1291 to hear this appeal from the judgment rendered under Federal Rule of Civil Procedure 54(b). The district court certified its final judgment on August 23, 2023, and Amazon noticed this appeal on September 15, 2023.

**ISSUES ON APPEAL**

1. Did the district court err in holding that Amazon cannot recover damages based on illicit kickback payments?

2. Did the district court err in holding that an association-in-fact racketeering enterprise cannot be inferred from evidence that a core group of individuals and the corporate entities under their control procured a series of high-value real-estate transactions through millions of dollars in illicit kickbacks?

3. Did the district court err in dismissing Amazon's claims for equitable relief on the ground that Amazon has an adequate remedy at law, when the adjudicated value of legal relief, if any, is known only after trial?

4. Did the district court err in shielding Atherton from liability for his participation in a conspiracy based on his purported attorney-client relationship with only some conspirators?

4

# STATEMENT OF THE CASE

## I.    Factual Background

### A.    Nelson and Kirschner had critical gatekeeping responsibilities at Amazon

Defendants Carleton Nelson and Casey Kirschner were real-estate transaction managers at Amazon. They were responsible for identifying and selecting locations, landlords, and developers for Amazon data centers in Northern Virginia; structuring and negotiating the terms of the real-estate transactions; and steering the transactions through Amazon's internal approval process. JA693-695, JA5581-5583, JA969-970, JA1035, JA6011, JA6057-6059, JA6159-6160. Amazon required Nelson and Kirschner to negotiate each transaction in Amazon's best interests. JA6483.

Nelson and Kirschner were gatekeepers. They "decide[d] what properties [Amazon] look[ed] at" and "who and what partners [it] work[ed] with"; and they "gather[ed] due diligence on all of the inputs around all of the fees, costs, terms, conditions, [and] technical attributes" of a deal. JA1344. Amazon leadership relied on Nelson's and Kirschner's recommendations and on the information they provided in entering into transactions that would cost Amazon hundreds of millions of dollars. JA6016-6017, JA6043, JA1420-1421, JA1443, JA1446-1448; JA6483; JA6487; *see also, e.g.*, JA6632, JA7151.

Nelson and Kirschner worked on two different types of real-estate transaction structures. In direct-purchase transactions, Amazon purchases land outright and then

develops facilities to suit its needs.  In build-to-suit lease transactions, Amazon iden-

tifies a suitable location and contracts with a real-estate developer, which purchases

the land and builds the facility's external shell.  Amazon leases the property and

completes the interior.  Amazon's rent is calculated by multiplying the project's total

budget, including the building costs and fees paid to the developer, by an agreed-

upon percentage called the "yield."  JA2457.

## B.    Nelson and Kirschner exploited their Amazon positions to steer deals in exchange for kickbacks

Defendants hatched their scheme in mid-2017 when Kirschner's brother,

Christian Kirschner,[1] introduced Defendant Brian Watson, founder and CEO of De-

fendant Northstar, to Kirschner.  JA6208-6209.

Northstar submitted its first Amazon bid—a purported response to a request

for proposal—to Kirschner in September 2017.  JA1476, JA6719.  Internal Northstar

e-mails confirm that, before that submission, Watson consulted with Nelson and

Kirschner about the bid, including ██████████████████████████████████

JA6897-6898.  Less than two weeks later, Kirschner advised Northstar that it won

the deal, JA6899-6901, though Amazon leadership did not approve the expenditure

required for the project until months later.  JA6902-6903.

---

[1] This brief refers to Casey Kirschner as "Kirschner" and his brother as "Christian," collectively "the Kirschners."

6

The summary analysis presented to Amazon leadership for approval relied on information that Nelson and Kirschner provided. JA6043, JA6633, JA6636, JA5581-5583. They falsely represented that Northstar had won in "a competitive bidding process." JA6636. In reality, ████████████████████████████████ ████████████████████████████ JA6974-6976.

No company records show that Nelson and Kirschner solicited bids from any other developers on any of the subsequent deals awarded to Northstar. Ultimately, between February 2018 and January 2020, Amazon executed nine leases with Northstar for data center properties in Virginia, all of which Kirschner and Nelson sourced, negotiated, and presented for approval. JA6633-6713. These transactions were worth hundreds of millions of dollars. JA2036. In each agreement, Watson—signing for the landlord-developer—promised to "promptly provide written notice" regarding "any improper solicitation, demand or other request for a bribe, improper gift or anything of value, made by any party in connection" with the lease.[2] *See, e.g.*, JA6568, JA6501-6502.

In exchange for Nelson's and Kirschner's assistance in securing Amazon deals for Northstar, Watson covertly paid them $3,375,625 in kickbacks, funded by more than $5.2 million in purported "referral fees" that Watson paid to the Villanova

---

[2] Amazon's counter-parties to those transactions were LLCs affiliated with Northstar that acted as landlord-developers for the properties: Dulles NCP LLC; Quail Ridge NCP, LLC; Manassas NCP LLC; and Dulles NCP II LLC. JA6495-6632.

Trust ("Villanova"), an entity Christian controlled.  JA2435-2436; JA2473; JA2973-2976; JA3011.  Watson's kickback arrangement with Nelson and Kirschner ensured that the cost of the purported referral fees would be "built into the lease rate cost" charged to Amazon.  JA2046-2047, JA2408-2411, JA2944, JA6444-6445.  Nelson and Kirschner hid from Amazon leadership that they and Christian would be receiving payments from Northstar.  *See* JA322, JA324-325; *see, e.g.*, JA6633-6660.  Amazon's executives "would not have approved any of those [deals]" had they known about the kickbacks.  JA6480-6481.

### C.    Nelson and both Kirschners conspired with Atherton and Watson to conceal their illegal scheme

Nelson and Kirschner knew they could be terminated if Amazon learned they took bribes.  JA1465-1466; JA776-778; JA2878.  They therefore worked with Christian and Atherton to conceal the scheme.  JA2878-2879.

Atherton created Villanova, a conduit for secret kickbacks from Northstar to Nelson and Kirschner.  JA2948-2949, JA2962, JA2436, JA1761-1766, JA2010-2020.  Through Christian, Watson and Kirschner negotiated a sham referral agreement for Villanova shortly before Northstar executed the first lease.  JA1714-1723, JA2021-2028, JA6377-6378, JA6391-6392.  The agreement required Northstar to pay Villanova a specified cut of the fees Northstar received on its Amazon leases.  JA2940-2941, JA1715-1716, JA2973-2975.  Kirschner instructed Christian and Watson on the financial terms to put in the referral agreement.  JA2021-2024.  There

is no evidence Villanova performed any services beyond receiving and disseminating the kickback payments related to the lease agreements. JA2940-2941, JA2948-2949, JA2973-2976. When Atherton created Villanova, he purportedly had an attorney-client relationship with Christian, but not Nelson or Kirschner. JA1763-1765, JA1785-1789.

### D.    Defendants inflated Amazon's costs to fund the kickbacks

Defendants tailored certain lease-agreement financial terms to fund the kickbacks. Christian directed Watson to increase the project budget for the first two lease transactions to include "Bldg 1 - $300k lease fee. Bldg 2 - $500k," JA2410-2412. These precise fees, absent from the initial draft budget, JA6731, made their way into the later budgets in both lease agreements shortly before Amazon signed them. JA6583, JA6632. These and other fees were to be "built into" the budgets as costs, thereby inflating Amazon's rent. JA2408, JA2407, JA2460. Kirschner and Northstar also increased Amazon's costs on subsequent deals by negotiating even higher yields—percentages used to determine Amazon's rent—than Northstar had agreed to for the first pair of deals. Internal e-mails relating to the very next lease transaction state that Northstar would have "be[en] okay with th[e] original proposal" at a lower yield, but that Kirschner coached Northstar on the highest yield that would "remain competitive for … internal review" "on paper." JA2415-2418.

The fees included in subsequent transactions were even higher, boosting returns to Villanova.  For example, the third deal's lease (IAD124) includes a budget with ██████████████████—the exact percentage Christian directed Watson to include, JA2025, after seeking Kirschner's confirmation that the term was "acceptable."  JA2021-2022, JA6507.  This fee, ██████████████████████, JA6507, was "built into the lease rate cost" to Amazon; Northstar would retain a share of the fee and kick the rest back to Villanova, JA2046-2047; *see* JA2025-2026, JA6371-6373.  Because Amazon's rent was calculated by multiplying the project costs by the yield, the increase in costs directly increased Amazon's rent.  JA2226, JA2407-2409; JA6444-6445.  As Amazon's expert explained, "the overall lease budget and Amazon's rent would have been lower, had the portion of Northstar's fees paid to Villanova Trust been eliminated."  JA2460.

Northstar also received other amounts ██████████████████ that Watson and the Kirschners routed through Northstar and Villanova into their own pockets.  JA7232, JA7241-7242, JA2021-2023, JA2413-2419.  Amazon's real-estate broker for the land purchases underlying the lease transactions ██████████████ ██████████████████████.  JA7162-7163.  But Kirschner directed the broker to route these rebates of more than $700,000 to Northstar instead, and Watson caused Northstar to pass most of these funds to Villanova for Nelson's and Kirschner's benefit.  JA2465, JA2474-2475, JA7167, JA7185.

### E.     Atherton created a web of sham entities to hide the kickbacks

Nelson, Kirschner, and Atherton worked together to establish a network of sham entities to receive and launder the payments from Villanova, JA2483-JA2509, JA2939, JA2945, JA7574-7576, JA7678-7682, including the 2010 Trust, AllCore Development LLC, CTBSRM, Inc., Finbrit Holdings LLC, and Cheshire Ventures LLC, JA2962-2972, JA7583-7584, JA7683-7695.  Nelson, Kirschner, and Atherton transferred portions of the kickbacks to these entities—and eventually to Nelson, Kirschner, and entities they controlled—as direct payments, uncollateralized sham "loans," or purported investments.  JA2473-2475, JA2488, JA2950-2958; *see also* JA871-874, JA1072-1073, JA1202, JA1244, JA1883, JA1885, JA1919-1920, JA1928-1929, JA3019-3032, JA5739-5740, JA5869, JA5911, JA7681.  Atherton acknowledged in an engagement letter that ██████████████████████ ████████████  JA7681, but nevertheless participated in exchange for his cut. JA7578.

### F.     Nelson, Kirschner, and Atherton expanded the enterprise to additional deals with more kickbacks

Having successfully steered several lease transactions to Northstar with the bribery scheme undetected, Nelson, Kirschner, and Atherton grew their unlawful enterprise to include two direct purchase deals: White Peaks and Blueridge.

***White Peaks*.**  Amazon purchased the White Peaks property in July 2019 from two LLCs controlled by then-Northstar employees Kyle Ramstetter and Will Camenson.  JA2459-2460, JA2845-2848.  Ramstetter and Camenson purchased the land and sold it later that day to Amazon for a one-day profit of approximately $15.6 million.  JA2478.  Both Kirschner and Nelson facilitated this deal within Amazon, although Nelson was fired (for misconduct unrelated to the kickback scheme) before the deal closed.  JA2874-2875, JA5423, JA7151, JA7154, JA7568-7570.  Ramstetter transferred nearly $1 million of the profits, via a middleman, to the Atherton-controlled 2010 Trust.  JA2478-2481, JA7583-7584.  The money was then routed to Nelson and Kirschner through other sham entities.  JA2466, JA2482-2494.

Watson discovered the transaction and demanded that Ramstetter and Camenson pay him their profit, on the theory that they had usurped a Northstar opportunity.  JA6193-6195.  Ramstetter and Camenson responded by ████████████████████ ████████████████████████████████████████. JA7619-7629.  █████████████ ████████████████████████████████████████████████████████████████ ████████████████ JA7630-7635.  ██████████████████████████████████ ██████████████ JA7636-7637, ████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████ JA7630-7635.

12

***Blueridge.*** Nelson and Kirschner arranged another purchase without Northstar. The Blueridge Transaction originated in early 2019, when Nelson and Kirschner explored a transaction with the land's owner. JA1598-1599, JA2921-2923. Instead of arranging for Amazon to buy directly from the landowner, Nelson and Kirschner introduced a third-party investor, the Blueridge Group, into the transaction, JA2452-2453, JA2459, JA4590-4591, JA1610, JA7039-7041, JA2928-2932. Nelson initially proposed the deal, and Kirschner pushed it through after Nelson's termination. They structured the deal such that Blueridge would purchase the land for $73 million, JA7640. Months later they arranged for Blueridge to transfer the purchase agreement to Amazon for a $10 million assignment fee, raising Amazon's cost to $83 million. JA7667-7677. Blueridge Group kicked back $4.8 million of that assignment fee to the Atherton-controlled 2010 Trust under the guise of a back-dated "finder's fee" agreement with Nelson and his Atherton-created entity, Finbrit. JA5229-5230, JA2933-2934, JA7582-7583. From there, Atherton transferred the funds to other shell entities beneficially owned by Nelson and Kirschner. JA2589-2593.

Kirschner oversaw the effort to have Amazon leadership approve these two deals after Nelson's termination. JA1039. As Nelson explained in a recorded conversation: "All these other deals we've got going on are gonna pay in. And a lot of them, I teed up before I left the business. Now Casey [Kirschner]'s gonna have to

13

get them—Casey will get them through.  He knows how to get them through."

JA2899, JA972-976.

### G.     Defendants richly profited

By the time Amazon discovered the scheme, at least $7,025,486 in kickbacks

had gone to Nelson ($2,455,152), Kirschner ($2,524,652), and Christian

($2,045,682), either directly or through associated entities.  JA2486, JA2490,

JA2495.  Nelson's and Kirschner's shell companies retained an additional

$3,310,886 for the benefit of Nelson and Kirschner.  JA2509; *see* JA718-719,

JA816-818, JA5739, JA5753-5754, JA5846-5848.  Atherton and associated entities

received $869,033.  JA2501, JA2509.  Watson personally received $5 million from

the White Peaks sale, on top of Northstar's substantial revenue.  JA2480-2481.  Wat-

son also funded lavish vacations for Nelson and Kirschner, including a Florida fish-

ing trip, a visit to Watson's ranch, and a New Zealand hunting trip.  JA3033-3047.

### H.     Amazon learned of the scheme and took corrective action

In early 2020, a whistleblower reported Nelson's and Kirschner's kickbacks

to Amazon.  JA2090-2091; JA6090.  Amazon began an internal investigation that

uncovered the fraud.  Dkt. 59 at 5-7.  Kirschner signed a confession during an FBI

interview admitting that "Northstar paid kickbacks, which were paid to the Villanova

Trust" and that he "accepted money from Northstar associated with deals I worked

on with Amazon."  JA2974.

Meanwhile, and before filing this lawsuit, Amazon executed lease-continuity agreements with IPI Partners LLC ("IPI"), which had helped Northstar fund the projects. *See* JA7225. (IPI ousted Northstar from its management role and assumed control of the landlord-developers that were parties to the leases.) The continuity agreements ███████████████████████████████████████████████ ███████████. *See* JA5078.

Nearly two years later, in December 2021, Amazon and IPI agreed to amended leases with the IPI-controlled landlord-developers, which ████████████████ ██████████████████████████████████████████████. JA5018-5019. No Defendant was a party to the renegotiated leases or lease-continuity agreements.

## II.    Procedural History

Amazon brought this action and obtained a preliminary injunction against Northstar and Watson to protect evidence and prevent asset dissipation, which this Court affirmed on appeal. *Amazon.com*, 2021 WL 3878403. Amazon's operative complaint asserts RICO, fraud, conspiracy, unjust enrichment, conversion, and other claims.[3] After this Court affirmed the injunction, Defendants moved to have the case reassigned. Dkts. 452, 463. Judge O'Grady concluded that "recusal is not required" but nevertheless granted reassignment. Dkt. 488.

---

[3] Some other defendants have defaulted, EDVA Dkts. 406, 447, 1291, but Amazon's claims against them remain live.

Defendants moved for summary judgment. The court ruled that Amazon's tortious-interference and conspiracy claims should go to trial, stating that "a reasonable juror could conclude that the Watson Defendants interfered with Nelson's and Casey Kirschner's employment relationships by bribing them and thereby depriving Amazon of its employees' honest services." JA3733. But it otherwise granted Defendants summary judgment.

The court deemed "Amazon's theory of damages unavailing" on both its RICO and fraud counts, JA3727, JA3732, reasoning that Amazon could prove damages *only* by "establishing the market value of the properties at the time of" these transactions, and had not done so. JA3728, JA3732.

The district court also held there could be no RICO enterprise, because "the undisputed material facts merely support a 'hub and spoke' or 'rimless wheel' structure to the alleged kickback scheme—a type of structure that is insufficient to establish an enterprise." JA3728-3729.

The district court did not dispute Amazon's ability to satisfy the elements of Amazon's unjust-enrichment and conversion claims, but dismissed them because Amazon "has an adequate remedy at law." JA3745.

Lastly, the district court granted Atherton summary judgment on Amazon's conspiracy claim, reasoning that Atherton was acting as Nelson's and Kirschner's

16

lawyer, and "an agent cannot be held liable for conspiring with its principal as a matter of law." JA3742.

The district court entered final judgment on the rejected claims pursuant to Federal Rule of Civil Procedure 54(b). JA3751-3754. This timely appeal followed.

## STANDARD OF REVIEW

This Court "review[s] de novo a district court's award of summary judgment, viewing the facts and inferences drawn therefrom in the light most favorable to the non-moving party." *Seabulk Offshore, Ltd. v. Am. Home Assurance Co.*, 377 F.3d 408, 418 (4th Cir. 2004). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 651 (4th Cir. 2021).

## SUMMARY OF ARGUMENT

**I.** The district court erred in rejecting Amazon's RICO and fraud claims for failure to prove the market value of the properties affected by the kickback scheme. Both under RICO's private cause of action, 18 U.S.C. § 1964(c), and Virginia common law, an employer is injured when its employees receive kickbacks or bribes from the employer's counter-parties. Kickbacks operate as a tax on the transaction, inflating the employer's costs. The employer may recover those costs as damages regardless of the market value of the underlying transaction. Moreover, the record

17

overwhelmingly shows that the kickbacks Nelson and Kirschner garnered on multiple Amazon real-estate projects directly increased Amazon's costs. Amazon is not required to prove damages by means of market-value estimates.

**II.** The district court erred in holding that Amazon cannot prove a RICO "enterprise." Defendants' wide-ranging, long-lived scheme embodies all "three structural features" of an association-in-fact enterprise: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009).

The district court improperly applied theories developed in conspiracy caselaw to hold that the supposed hub-and-spoke structure failed RICO's enterprise requirement. That added limitation is inapplicable to the enterprise element and inconsistent with *Boyle*. Regardless, the record supports extensive connections among a core group—at least Nelson, Kirschner, and Atherton—who interacted with one another on *all* the deals. Others, including Watson, Northstar, Christian Kirschner, Ramstetter, and various corporate entities they controlled, interacted extensively on most deals. These others can be liable under RICO even if not members of the enterprise.

**III.** The district court erred in rejecting Amazon's claims for conversion and unjust enrichment by assuming an adequate remedy at law, because a trial is needed

to ascertain the adequacy of that remedy. Moreover, the record shows that Amazon's equitable relief—including constructive trust or disgorgement—exceeds its legal damages. That is precisely why this Court held, in the preliminary injunction appeal, that Amazon was entitled to maintain its unjust enrichment and conversion claims alongside its legal claims. The district court erred in stating that changed circumstances justified departing from this Court's mandate, because nothing had changed: this Court considered and rejected the same circumstances when Northstar presented them the first time around.

**IV.** The district court erred in granting summary judgment for Atherton on Count V (civil conspiracy) under the principal-agent conspiracy doctrine. Even if Atherton had acted solely as Nelson's and Kirschner's agent in this scheme, the doctrine would not apply, because the conspiracy includes third parties. Regardless, as Atherton himself conceded, he had no attorney-client relationship with Nelson and Kirschner when he joined the conspiracy. And even after he purported to become their attorney, his criminal conduct so far exceeded the proper bounds of the attorney-client relationship that it ceased to protect him. At the very least, his asserted agency relationship is a question of fact for a jury.

# ARGUMENT

## I.    Amazon Suffered Injury And Has Recoverable Damages Under Its RICO And Fraud Claims

The district court rejected Amazon's RICO and fraud claims, reasoning that Amazon "cannot *prove* that it overpaid because there is no evidence in the summary judgment record establishing the market value of the properties at the time of the lease and direct purchase transactions." JA3728 (RICO); *see* JA3731 (same as to fraud). This was legal error.

### A.    Amazon is harmed and can recover RICO damages in the amount of the kickbacks paid

The RICO statute "provides a private right of action for treble damages to 'any person injured in his business or property by reason of a violation' of the Act's criminal prohibitions." *Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 641 (2008) (quoting Section 1964(c)). This requires simply "damage to 'business or property' proximately caused by the defendant's RICO violation." *Potomac Elec. Power Co. v. Elec. Motor and Supply, Inc.* (*PEPCO*), 262 F.3d 260, 264 (4th Cir. 2001) (quoting Section 1964(c)). Congress has "express[ly] admoni[shed]" that "RICO is to 'be liberally construed to effectuate its remedial purposes,'" and, "if Congress' liberal-construction mandate is to be applied anywhere, it is in § 1964, where RICO's remedial purposes are most evident." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 492 n.10, 498 (1985) (quoting Organized Crime Control Act of 1970, Pub. L. No. 91-452, 84 Stat. 947).

Amazon satisfies RICO's injury requirement in two independent ways. First, as a matter of law an employer can recover as damages the amount an employee received as kickbacks. Second, the record independently shows that the scheme here increased Amazon's costs to fund the kickbacks.

### 1. An employer can recover, as damages, the amount of kickbacks received by its employees

It is a well-established tort law principle that "[t]he victim of commercial bribery," usually "the principal of an agent who was bribed, can obtain by way of remedy … the damages that he has sustained[.]" *Williams Elecs. Games, Inc. v. Garrity*, 366 F.3d 569, 576 (7th Cir. 2004). The kickbacks "can be used as a minimum estimate of damages … on the theory that no one would pay a bribe who didn't anticipate garnering net additional revenue at least equal to the amount of the bribe; and that additional revenue is … an additional expense to the person whose agent was bribed." *Id*. "[T]he amount of the bribe provides a reasonable measure of damage," because it "is, after all, the value the [party paying the bribe] placed on their corruption of the … employees." *Cont'l Mgmt., Inc. v. United States*, 527 F.2d 613, 619 (Ct. Cl. 1975); *see also id.* at 616-17 (collecting authorities); *see generally* 2 Dobbs, Law of Remedies § 10.6 (2d ed. 1993) ("it may be assumed that the briber would have sold at a lower price if he had not had to pay the bribe"). Thus, commercial bribery "operates as a privately-imposed transaction cost on the affected sale—similar, in many ways, to a 'swipe fee' for credit card transactions or even a sales tax."

21

*S.C. Johnson & Son, Inc. v. Transp. Corp. of Am., Inc.*, 697 F.3d 544, 559 (7th Cir. 2012).

Courts regularly recognize that commercial bribery inflicts a RICO injury. *See, e.g.*, *City of New York v. Citisource, Inc.*, 679 F. Supp. 393, 398 (S.D.N.Y. 1988) ("When a contract is procured through bribes to an agent of one of the contracting parties, the defrauded principal is entitled to recover as damages the value of the bribes and the amounts paid under the fraudulently procured contract."); *Hino Motors Mfg. U.S.A. Inc. v. Hetman*, 2022 WL 16709717, at *3 (E.D. Mich. Aug. 4, 2022) (RICO plaintiff "may recover … kickback payments … as monetary damages"); *Dolan v. JetBlue Airways Corp.*, 385 F. Supp. 3d 1338, 1354 (S.D. Fla. 2019) (RICO injury exists where plaintiff paid "unknowingly, for a kickback"); *Hellenic Lines, Ltd. v. O'Hearn*, 523 F. Supp. 244, 248 (S.D.N.Y. 1981) ("RICO clearly permits private law suits by a firm forced to pay bribes or kickbacks of any kind").

The district court acknowledged, but declined to follow, this reasoning. JA3727. The authorities it cited for a "market value" proof requirement, JA3728, are inapt. *Baehr v. Creig Northrop Team, P.C.* addressed Article III standing for a RESPA (not RICO) claim brought by home purchasers alleging that a marketing agreement between realtors and a title company violated RESPA's prohibition on undisclosed referral payments. 953 F.3d 244, 248-54 (4th Cir. 2020). The plaintiffs failed to identify any "harm 'traditionally … regarded as providing a basis for a

lawsuit.'" *Id.* at 254 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). Their primary assertion—that they had been deprived of "impartial and fair competition"—failed because they offered "no evidence that impartial or fair competition between settlement services providers was even relevant to their decision" to use the title company. *Id.* at 254, 256. The plaintiffs' alternative argument—that the defendants "owed them fiduciary duties to return any kickback"—failed because no defendant "st[ood] in a fiduciary relationship" to the plaintiffs. *Id.* at 256 (quotation marks omitted). Here, by contrast, Amazon has asserted harm long recognized as a cognizable injury. *See* pp. 21-22, *supra*. Moreover, Kirschner and Nelson were Amazon employees who owed inherent fiduciary duties to Amazon. *See Skilling v. United States*, 561 U.S. 358, 407 n.41 (2010) (identifying "employee-employer" as "fiduciary relationship" breached by acceptance of "bribe[s]"); Restatement of Employment Law § 8.01 (2015) (employees "owe a fiduciary duty of loyalty to the employer" breached by "engaging in self-dealing through the use of the employee's position"); JA1465. Accepting bribes breached this duty, injuring Amazon.

The district court's other cases are also inapt. In *West Virginia v. Moore*, the state brought a RICO claim against a former governor who took bribes from "coal companies." 895 F. Supp. 864, 867 (S.D.W. Va. 1995). But those bribes did not cause any State expenditures, which defeated any inference of inflated payments.

*Id.* at 869.  Here, by contrast, the bribe payments secured transactions in which Amazon paid the bribers hundreds of millions of dollars.

Similarly, in *Marlboro v. Scannapieco*, the town bringing RICO claims was not a "party to a commercial transaction," and the bribes did not result in any town expenditures.  545 F. Supp. 2d 452, 458 (D.N.J. 2008) (quotation marks omitted).  In *Curiale v. Capolino*, the court awarded damages in *excess* of the kickback amount, 883 F. Supp. 941, 948-49 (S.D.N.Y. 1995), so it provides no support for the district court's decision.

### 2. *This record independently shows that kickbacks increased Amazon's costs*

Separate from the well-established legal principle that commercial bribery inflicts harm on the victim, Amazon also presented case-specific evidence that *this* scheme directly increased the costs it paid for the transactions.

On the lease transactions, both Kirschners, Nelson, and Watson arranged to inflate certain fees that Northstar (through the landlord entities it controlled) charged Amazon, with the proceeds funding the "referral fees" Northstar paid to Villanova.  JA2460.  The relationship between fees Northstar charged Amazon and the kickbacks it paid to Villanova was explicit—Villanova's agreement with Northstar named the specific fees Northstar would receive on the Amazon leases and directed that Villanova would receive "Participation/Sharing" in each.  JA1715-1716, JA1720.  Christian, at his brother's direction, negotiated with Watson the specific

24

fees to include in the Villanova agreement, as evidenced by e-mails and text messages in which Kirschner explicitly identified the lease fees to include. For example, Kirschner and Christian exchanged e-mails devising the exact fee structure (*e.g.* "2% Fee on the Lease. 1.25% to CK and .75% to NCP"), JA2022, that Christian quoted to Watson days later, JA2046-2047. ███████████████████████ ███████████████████, and that same fee structure appears in the agreement Villanova and Northstar executed weeks later, JA1720 ("Lease Commission Rate 1.25%" payable to Villanova).

Amazon's monthly rent was calculated on a cost-plus basis that considered fees paid to Northstar as a cost that, along with other lease expenses, were multiplied by the yield. Thus, the increased fees to fund Villanova kickback payments directly increased Amazon's monthly rent. JA2460. Indeed, when Watson and both Kirschners negotiated the split of fees between Northstar and Villanova, Watson explained that the "cost shall be built into the lease rate cost for the tenant [i.e., Amazon]," with the money paid to Villanova "rolled into the rent" charged to Amazon. JA2047, JA2407.

Amazon's expert opined that "[i]f the Scheme did not exist, Northstar could have charged lower development and leasing fees to the Landlord Entities and still netted the same profit because its net costs would have been lower by eliminating the portion of the fees paid to Villanova Trust that were ultimately passed on to

25

Carleton Nelson, Casey Kirschner, Kyle Ramstetter, and other Defendants." JA2460. Because the fees "factored into Amazon's monthly rent," "Amazon would have been able to negotiate for lower lease rates, and the overall lease budget and Amazon's rent would have been lower, had the portion of Northstar's fees paid to Villanova Trust been eliminated." JA2460.

The evidence for the two purchase transactions likewise shows that the kick-back scheme directly inflated Amazon's costs. Amazon's expert identified evidence showing that "Amazon paid inflated purchase prices for the Blueridge Transaction and White Peaks Transaction" and that the price inflation "benefited the Defendants." JA2460.

Specifically, Amazon "paid a $10,000,000 assignment fee" on the Blueridge deal, "of which $4,818,956 went to" Nelson and Kirschner; Amazon "as a result, suffered actual economic harm of $10,000,000," or, at the very least, was damaged by the $4.8 million diverted to Nelson and Kirschner. JA2466. Kirschner admitted he "was involved in negotiating" the assignment fee with Blueridge, setting it at "10 million," and getting it approved by Amazon. JA1647-1648. Nelson's entity (via a strawman) signed a "Finder's Fee Agreement" with the Blueridge Group that promised Nelson ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████. JA5230. Nelson then caused

26

Atherton to transfer 50% of the net assignment fee to the shell companies benefi-
cially owned by Nelson and Kirschner. JA2482-2494. Absent the kickback arrange-
ment, Amazon could have acquired the land directly or, at a minimum, paid a much
smaller assignment fee.

Similarly, Ramstetter and Camenson charged a $17.7 million same-day mark-
up to Amazon on White Peaks. JA2478. One million dollars of that mark-up went
to Nelson and Kirschner via a middleman who ███████████████████████
███████████████████████. JA7595 ████████████████; JA2476
████████████████████; JA7601-7608 ████████████████████
████████████████. A further $5 million from White Peaks went to
Watson in ████████████████. JA2480; *see* p. 12, *supra*. As a result, "Am-
azon paid an inflated price" and "suffered economic harm of … $6,000,000."
JA2466.

This record clearly permits a jury finding that the kickback scheme increased
Amazon's costs. The district court erroneously suggested that the lease transactions
must have been advantageous because Amazon chose to keep the leases. JA3728
n.18. But Amazon did not affirm the fraudulent leases; it negotiated *revised* leases
with a new counter-party to address the fraud scheme, ████████████████.
*See* JA7234 (estimating anticipated harm). Moreover, any resulting savings applies
*after* trebling and goes to the amount of recovery, not the existence of the claim.

27

*Morley v. Cohen*, 888 F.2d 1006, 1013 (4th Cir. 1989) (mitigation offsets damages *after* trebling).

The district court's demand for market-value evidence is unsuited to large commercial real-estate transactions, particularly those involving data center projects that are highly bespoke and idiosyncratic, as any estimate of value would necessarily be a broad range. JA1440-1441. Defendants took full advantage of this to conceal the scheme. Ramstetter said Kirschner coached him to increase the lease-transaction fees proposed by Northstar to fund the kickbacks while "remain[ing] competitive for [Amazon's] internal review" "on paper." JA2415-2416. A market-value evidence requirement would create a new safe harbor for bribes and kickbacks that are a small percentage of total deal value. For cases like this, involving real-estate deals worth more than $500 million, fraudsters could reap millions with impunity.

Amazon also showed that Defendants diverted to themselves more than $700,000 in rebates that KBC Advisors, Amazon's real estate broker, had ███████

███████ . At Kirschner's direction, KBC instead sent those rebates to Northstar, which passed the money to Villanova for Nelson and Kirschner's benefit. JA7232. The district court disregarded this direct evidence of damages, crediting Defendants' assertion that Amazon failed to disclose them. JA3726. But Amazon included these

28

diverted rebates in the total damages it claimed from the scheme,[4] and Defendants took extensive discovery on the rebates.[5]  When a defendant is not "surprise[d]" by the relevant evidence, there is no basis to exclude those damages from trial.  *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003) (discussing factors including surprise and ability to prepare for trial on issue).  More-over, Defendants' own actions show they needed no further discovery on this is-sue—after receiving Amazon's damages report, they (successfully) sought addi-tional fact discovery, Dkt. 1144, but not on the KBC rebates.

Amazon did precisely what the caselaw cited by the district court requires to preserve a damages claim.  *Compare Silicon Knights, Inc. v. Epic Games, Inc.*, 2012 WL 1596722, at *1, *3 (E.D.N.C. May 7, 2012) ("a party may supplement its Rule 26(a)(1)(A)(iii) 'computation' by producing an expert report" with "a computation of each category of damages" and "a discussion of the documents or other eviden-

---

[4] *See* JA2433-2435 (calculating "commission rebates owed to Amazon, but paid to Northstar by KBC Advisors"); JA2474-2475 ("Monies related to Dulles and Quail Ridge were paid to Villanova Trust from KBC Advisors, through Northstar" in vio-lation of Amazon's rebate agreement).

[5] For example, Defendants designated "the rebates paid by KBC Advisors to Ama-zon with respect to real estate purchase or … lease transactions" as a topic for Am-azon's 30(b)(6) deposition and Amazon offered a witness on that topic.  *See* JA6060-6066; Dkt. 902-4 at 21.  Defendants also deposed Amazon's broker and Amazon's damages expert on this issue.  JA7157-7175; JA3292-3299; *see also* JA3289.

29

tiary material" (quotation marks omitted)), *with* Dkt. 518-4 (Amazon's damages dis-
closure included "all fees received … [by Northstar] in an amount of at least
$15,263,163"); JA2433-2435 (damages expert's report including "$781,680" la-
beled "KBC Advisors" in "Actual Economic Harm to Amazon" and in "Northstar
Receipts" totaling $15,375,305.  Other cited cases excluded evidence that was never
disclosed at all in discovery, *see Nelson-Salabes, Inc. v. Morningside Dev., LLC*,
284 F.3d 505, 512 n.10 (4th Cir. 2002), or did not exclude damages, *see Companion
Prop. & Cas. Ins. Co. v. U.S. Bank Nat'l Assoc.*, 2016 WL 3452734, at *2 (D.S.C.
June 24, 2016) (instead, granting a motion to compel a supplemental disclosure).
Neither applies here.

Nor can the district court's failure to acknowledge this evidence of damages
be justified by its decision to disregard Amazon's statement of facts.  The district
court erred in asserting "[t]here is no provision in the Local Rules that invites" Am-
azon's statement.  JA3712.  The relevant local rule specifically authorized Amazon
to "list[] all material facts as to which it is contended that there exists a genuine
issue" and to cite supporting evidence.  E.D. Va. Loc. Civ. R. 56(B).[6]

---

[6] Moreover, Amazon's statement was not an attempt to evade page limits—its entire
brief was within the limit set by the court (some 53 pages fewer than Defendants'
opening briefs).  *Contra Nifong v. SOC, LLC*, 234 F. Supp. 3d 739, 744 (E.D. Va.
2017) (separate narrative outside page limits that failed to cite evidence in responsive
statement); *Integrated Direct Mktg., LLC v. May*, 129 F. Supp. 3d 336, 344 (E.D.
Va. 2015), *aff'd*, 690 F. App'x 822 (4th Cir. 2017) (no response to movant's fact

This ample direct evidence of financial harm *exceeds* the requirement for RICO injury. *See PEPCO*, 262 F.3d at 263-65 (injury in RICO case does not require plaintiff to show product was "less valuable" because of deception). Given the undisputed evidence that Amazon employees received a cut of the value of Amazon deals—and that those payments directly increased Amazon's costs—Amazon need not offer market comparison evidence.

## B.   Amazon is harmed and can recover state-law fraud damages in the amount of the kickbacks paid

The district court made the same error in rejecting Amazon's state-law fraud claims, concluding Amazon was required to "put forth … evidence that the market value of the properties" was less than "what it paid for those properties." JA3731. That is wrong under state law, too. "When the victim is a buyer of the briber's goods, it may be assumed that the briber would have sold at a lower price if he had not had to pay the bribe. The idea is that the briber who gives a 10% kickback to the purchasing agent would just as soon give a 10% discount to the victim; or alternatively, that if the briber expects to benefit by at least the amount of the bribe, he must

---

statement). In any event, a local rule "imposing a requirement of form must not be enforced in a way that causes a party to lose any right because of a nonwillful failure to comply." Fed. R. Civ. P. 83(a)(2). The only authority cited below that similarly refused to consider a respondent's factual narrative was reversed because it "improperly resolved a number of factual findings against" the non-movant. *ImmunoGen, Inc. v. Hirshfeld*, 2022 WL 885774, *4 (Fed. Cir. Mar. 25, 2022). So too here.

be inflicting an injury in the same degree."  2 Dobbs, Law of Remedies § 10.6 (col-

lecting cases); *see also id.* §§ 4.3-4.5 (concerning restitution remedy).[7]

Virginia common law is in accord.  In *Byrd v. Crosstate Mortgage & Invest-*

*ments, Inc.*, the court rejected a defendant's argument that "even if they breached a

fiduciary duty in not disclosing" kickbacks, the "plaintiffs were not harmed" because

they agreed to the transaction at the stated price.  34 Va. Cir. 17 (1994).  The court

allowed the fraud claim to proceed, seeking the undisclosed payments as damages.

*Id.*  Under a century of Virginia law, where a deal is procured through commercial

bribery the "court will … require the party profiting by the fraud to surrender the

benefit he has received."  *Millboro Lumber Co. v. Augusta Wood Prods. Corp.*, 125

S.E. 306, 421 (Va. 1924).

Virginia's common-law rule is broadly entrenched.  *See, e.g.*, *Cont'l Mgmt.*,

527 F.2d at 619 (collecting cases); *Donemar, Inc. v. Molloy*, 169 N.E. 610, 611 (N.Y.

1930) ("If … a vendor bribes a purchaser's agent it must be assumed that the pur-

chase money is loaded by the amount of the bribe"); *AmTruck Factors v. Int'l Forest*

*Prods.*, 795 P.2d 742, 746 (Wash. Ct. App. 1990) ("[t]he proper measure of damages

where a kickback scheme is proven is the amount of kickbacks paid"); *Kewaunee*

---

[7] The same tortious conduct can give rise to the same remedies whether framed as a breach of a duty of loyalty or as a specific tort such as fraud.  "In such cases courts can conceptualize the tort either way—as a fiduciary breach or as the specific named tort."  3 Dobbs, Law of Torts § 699 (2d ed. 2011).

*Sci. Corp. v. Pegram,* 503 S.E.2d 417, 418 (N.C. Ct. App. 1998) ("commercial brib-ery harms an employer as a matter of law, and the proper measure of damages suf-fered must include at a minimum the amount of the commercial bribes the third party paid"); *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942) (agent accepting kickbacks "must account to his principal for all he has re-ceived" (quoting *United States v. Carter*, 217 U.S. 286, 306 (1910))); *Phillips Chem. Co. v. Morgan,* 440 So.2d 1292 (Fla. Dist. Ct. App. 1983) (adopting rule of *Kinz-bach*).

This Court has applied that same principle, affirming judgment under Mary-land law for a buyer in the amount of kickbacks paid to an agent without any refer-ence to the underlying market value of the horses purchased through the kickbacks. *Gussin v. Shockey*, 933 F.2d 1001 (4th Cir. 1991) (unpublished).[8]  And in *Western Contracting Corp. v. Bechtel Corp.*, also applying Maryland law, this Court permit-ted recovery of *both* the total amount paid under a specific contract clause procured by a kickback *and* the amount of the kickbacks, concluding that this was not a "dou-ble recovery" but rather compensations for "two harms" that were the "result of the

---

[8] *Gussin* is one of many cases demonstrating the commonality of relief for claims of fraud and breach of an agent's fiduciary duty.  The district court there granted iden-tical damages on both claims measured by the amount of the kickbacks, 725 F. Supp. 271, 275-76 (D. Md. 1989), and this Court affirmed.

fraud: overcharges … and diversion of their employees' loyalty."  885 F.2d 1196, 1206-07 (4th Cir. 1989).

Courts have rejected the precise argument that the district court accepted here—that "unless the plaintiff established some disparity between the value of the goods received … and the consideration paid" no recovery is possible.  *Donemar*, 169 N.E. at 611; *see also Kewaunee*, 503 S.E.2d at 419 (plaintiff need not prove "out of pocket loss due to the transaction"); *Kinzbach Tool*, 160 S.W.2d at 573 ("It would be a dangerous precedent for us to say that unless some affirmative loss can be shown, the person who has violated his fiduciary relationship … may hold on to any secret gain or benefit ….").  Similarly, in *Western Contracting* this Court rejected the argument that Bechtel had not shown an overcharge by failing to introduce evidence of the "value of Western's performance" or of "the form th[e] clauses would have taken, absent fraud."  885 F.2d at 1202, 1203.

The district court's authorities do not alter this long-standing rule; none even involves kickbacks or bribery.  Rather, the alleged fraud invariably involved deception about the property's *condition or attributes*.  *See, e.g.*, *Klaiber v. Freemason Assocs., Inc.*, 587 S.E.2d 555, 559 (Va. 2003) (failure to disclose roof, chimney, and fireplace defects); *Prospect Dev. Co., Inc. v. Bershader*, 515 S.E.2d 291, 294 (Va. 1999) (misrepresentation that neighboring parcels were protected from development); *Nahigian v. Juno-Loudon, LLC*, 2010 WL 3418179 (E.D. Va. Aug. 23, 2010)

34

(misrepresentation that luxury brand would manage HOA); *Sharma v. USA Int'l, LLC*, 851 F.3d 308, 309 (4th Cir. 2017) (misrepresentation about revenue of businesses sold); *Patel v. Anand, LLC*, 564 S.E.2d 140, 144 (Va. 2002) (no recovery for costs incurred renovating hotel or clearing title). These are prosaic real-estate fraud cases about undisclosed defects, not concealed kickbacks or bribes. *See generally*, 3 Dobbs, Law of Torts § 682 (2d ed. 2011) (measure of damages for fraudulently concealed defects in real estate). They simply reject "repair or replacement costs" as a "proper measure of damages for fraud" when relevant conditions were concealed. *Klaiber*, 587 S.E.2d at 559 (citation omitted).[9]

Finally, the district court erred in suggesting that Amazon had conceded the issue. *Contra* JA3732. An "argument is preserved if pressed or passed upon" in the district court. *United States v. Pratt*, 915 F.3d 266, 271 n.4 (4th Cir. 2019) (citing *United States v. Williams*, 504 U.S. 36, 41 (1992)). Amazon *pressed* the argument by robustly contesting Defendants' assertions that it could recover damages only by presenting expert evidence of market values, JA632-635, JA655-656, including by relying on and distinguishing state-law real-estate fraud cases, JA630 (applying *Amtruck*, 795 P.2d at 746); JA655 (distinguishing *Folmar v. Harris*, 650 F. App'x 818 (4th Cir. 2016)). This sufficed to preserve Amazon's argument for appeal, and

---

[9] *Long & Foster Real Estate, Inc. v. Clay* (JA3731) did not involve a fraud claim at all. 343 S.E.2d 297, 298-99 (Va. 1986) (alleging agent's fiduciary breach for not explaining a subordination clause).

Amazon is permitted to present new authorities in support of that argument. *See Templeton v. Jarmillo*, 28 F.4th 618, 622 (5th Cir. 2022) ("A new precedent is not a new argument; it is new support for an existing argument."); *Flyers Rights Educ. Fund, Inc. v. FAA*, 864 F.3d 738, 748 n.6 (D.C. Cir. 2017) ("party cannot forfeit or waive recourse to a relevant case just by failing to cite it"). Defendants likewise treated the damages and injury arguments for the RICO and state-law fraud claims as rising or falling together, including through express cross-references between the two arguments. *See* Dkt. 1174 at 37; Dkt. 1176 at 17-19, 25. No waiver occurred.

In addition, the district court expressly *passed upon* the issue, ruling that Amazon's fraud claim failed as a matter of law because, "in common law fraud cases involving purchases or leases of property," a plaintiff can only recover damages based on evidence of the market value of the property. JA3731. This is independently sufficient to preserve the issue for appeal. *See Williams*, 504 U.S. at 41 ("permitting review of an issue," "so long as it has been passed upon"). The district court's ruling also presents "a question of law that [this Court is] free to consider." *Massey v. Va. Polytechnic Inst. & State Univ.*, 75 F.4th 407, 412 n.2 (4th Cir. 2023). "'When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.'" *Id.* (quoting

*Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991)).  This Court should reverse on the state-law fraud claim too.

## II.  The Record Supports A Finding That Defendants Formed A Racketeering Enterprise

The district court ruled as a matter of law that no enterprise existed because the evidence showed a mere "'hub and spoke' or 'rimless wheel' structure to the alleged kickback scheme."  JA3729.  In doing so, the court erroneously imposed inapt conspiracy-law requirements on a RICO claim.  Indeed, "through RICO, Congress intended to" "replac[e] the[se] inadequate 'wheel' and 'chain' rationales with a new statutory concept: the enterprise."  *United States v. Elliott*, 571 F.2d 880, 902 (5th Cir. 1978).  The district court ignored that one can unlawfully participate in the conduct of an enterprise's affairs without being an enterprise *member*, as well as the record evidence showing ongoing and extensive connections between the Defendants.

### A.    The evidence of enterprise is sufficient to require a trial

Liability for RICO violations extends to those who participate in the conduct of an enterprise's affairs or conspire to do so.  18 U.S.C. § 1962.  A RICO "enterprise" "includes any individual, partnership … association … or group of individuals associated in fact although not a legal entity."  *Id.* § 1961(4).  The term "enterprise" "is obviously broad, encompassing '*any* … group of individuals associated in fact.'"  *Boyle*, 556 U.S. at 944 (quoting 18 U.S.C. § 1961(4)).  Congress's use of "'any'

37

ensures that the definition has a wide reach, and the very concept of an association in fact is expansive." *Id.* (citation omitted). The Supreme Court has repeatedly rejected arguments that would cabin RICO's enterprise element. *See Boyle*, 556 U.S. at 951; *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 262 (1994); *United States v. Turkette*, 452 U.S. 576, 580-81 (1981).

> 1. *The district court erred in applying the requirements for common-law conspiracy*

The district court erred in concluding "the undisputed material facts merely support a 'hub and spoke' or 'rimless wheel' structure … insufficient to establish an enterprise." JA3729 (citation omitted). The rimless-wheel or hub-and-spoke standard is a limitation on conspiracy claims; it does not apply to RICO's enterprise element.

Under RICO, "conspiracy remains conspiracy," but an "associated-in-fact enterprise is plainly intended to be something different and less difficult of proof." *United States v. Griffin*, 660 F.2d 996, 1000 (4th Cir. 1981). Congress designed RICO "[t]o relieve some of the deficiencies of the traditional conspiracy"—in particular, to address "the increasing complexity of 'organized' criminal activity," which "made it difficult to show the single agreement or common objective essential to proof of conspiracy on the basis of evidence of the commission of highly diverse crimes by apparently unrelated individuals." *Id.* at 999. "[T]hrough RICO, Con-

gress intended to authorize the single prosecution of a multi-faceted, diversified conspiracy by replacing the inadequate 'wheel' and 'chain' rationales with a new statutory concept: the enterprise." *Elliott*, 571 F.2d at 902.  Indeed, a single individual cannot legally conspire with himself, but "an 'enterprise' under § 1962(c) can exist with only one actor to conduct it." *Salinas v. United States*, 522 U.S. 52, 65 (1997).

The district court's primary authority for its rimless-wheel theory, *Dickson v. Microsoft Corp.*, is an antitrust conspiracy case that does not address RICO's enterprise element at all.  309 F.3d 193, 204 (4th Cir. 2002).  Contrary to the district court's reasoning, there is no requirement that each RICO defendant participate in every predicate act—RICO liability exists even when "faces in the group may have changed." *United States v. Tillett*, 763 F.2d 628, 631 (4th Cir. 1985); *United States v. Fiel*, 35 F.3d 997, 1004 (4th Cir. 1994) (similar).  The district court's rimless-wheel limitation is simply inapplicable to the RICO enterprise element.

### 2.  The record supports an association-in-fact enterprise

Ample facts in the record show the connections—financial, contractual, and otherwise—sufficient to demonstrate all "three structural features" of an "association-in-fact enterprise": "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946.

*Purpose*:  Defendants shared a common purpose of extracting financial gain from Amazon real-estate deals procured through kickbacks.  This Court has repeatedly held that "the common purpose" of "making money" through unlawful conduct is sufficient to satisfy this prong of the enterprise standard.  *Tillett*, 763 F.2d at 631; *see also United States v. Gross*, 199 F. App'x 219, 235 (4th Cir. 2006) ("shared purpose of making money by illicit means, including … fraud"); *United States v. Mathis*, 932 F.3d 242, 259 (4th Cir. 2019) ("common function and purpose … to enrich members").

Defendants also shared a common purpose of concealing the existence of the kickbacks from Amazon.  *See United States v. Fattah*, 914 F.3d 112, 164-67 (3d Cir. 2019) (shared goal of secrecy demonstrated common purpose despite absence of unifying "rim" connecting all members of enterprise).  As Ramstetter explained in one recording, if the scheme "gets out, the whole Amazon thing is shut down." JA3692.  Watson and Northstar disguised their payments behind the "referral agreement" with Villanova and Christian.  Watson ███████████████████████ ████████████████████████████████████████████.  JA7619-7635. Atherton set up a complicated web of trusts for the sole purpose of secrecy, JA2938, and expressly acknowledged the objective of "keep[ing] the details of the trust assets, income and operations secret," JA2962, JA7683, JA7694-7695.  As Nelson put it, "Rod [Atherton's] job is to make us invisible," in that "our names are completely

scrubbed off everything." JA2878-2879.  And Atherton, Nelson, and Kirschner used

"an organization structure" that did "virtually no real estate development work"

other than "channeling money to others" through sham loans that "do not appear to

be commercially reasonable arm's-length transactions."  JA2939 (tracing money).

*Relationships*:  RICO does not require that every defendant participate in each

act, or throughout the lifetime of the racket.  Although some relationship between

enterprise members is necessary, it "need not have a hierarchical structure or a 'chain

of command'; decisions may be made on an ad hoc basis and by any number of

methods … [m]embers of the group need not have fixed roles; different members

may perform different roles at different times." *Boyle*, 556 U.S. at 948.  "[S]tructural

changes within the enterprise" or changes in personnel across various predicate acts

do not "preclude a finding that an ongoing enterprise existed." *United States v. Cot-*

*tone*, 928 F.2d 400, at *2 (4th Cir. 1991) (unpublished).  A racketeering enterprise

exists "[a]lthough the faces in the group may have changed." *Tillett*, 763 F.2d at

631; *Fiel*, 35 F.3d at 1004 (enterprise existed with "some members retiring as new

members joined").

Defendants' scheme exhibited the necessary relationships.  *See, e.g.*, JA2548

(charting flow of funds and corporate structure).  Nelson and Kirschner were the

insiders, ensuring that Amazon approved the deals.  Atherton was the consigliere

and facilitator, laundering the proceeds.  JA2501-2503, JA2939 (Atherton "created

41

a series of companies, none of which appear to have any employees, other than one officer whose primary responsibility is to sign documents," and "none of the companies appear to have a function other than to provide a conduit to channel money to … Nelson and Kirschner").  Christian acted as the middleman for the lease transactions.  *See, e.g.*, JA2473-2475 (tracing flow of funds from Northstar through Villanova to Nelson and Kirschner).  Northstar and the White Peaks entities were the counter-parties that paid bribes to secure shared profits.  In Blueridge, which did not involve Northstar, the fundamental relationships remained consistent.  Kirschner and Nelson, prior to his departure, shepherded the deal "into the formal approval process" as Amazon insiders, and Kirschner caused Amazon to approve the Blueridge assignment fee that funded the kickback.  JA5624, JA5952, JA5632-5633, JA7141-7143.  Nelson remained involved in the deal through a backdated "finder's fee" arrangement with Blueridge's developer, JA5229-5230; JA7583, assuming the middle-man role occupied by Christian in the lease deals.  And Nelson then shared the "finder's fee" ($4.8 million) with Kirschner.

The district court ignored Atherton's role in the enterprise completely—and it rejected enterprise status—by reasoning that Amazon "has attempted to lump together Defendants connected to *three* distinct enterprises (the lease transactions, the White Peaks Transaction, and the Blueridge Transaction) into a single enterprise because two Amazon employees were at the center of each transaction."  JA3729.

42

That misstates the record and the law.  The leases alone consisted of *nine* transactions, executed through dozens of RICO predicate acts spanning nearly two years, with a total value of $430 million.  JA2455.  The personnel and the structure of the fraud were identical for each lease transaction, making them alone sufficient to establish an enterprise.

White Peaks and Blueridge involved unlawful participation in that same enterprise.  *See ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 182-83 (4th Cir. 2002) (conspirators' involvement "in other credit scams" using "eerily similar" methods and several of "[t]he same individuals" proved pattern of racketeering activity).  The minor variations between the lease frauds and the purchase frauds are simply "structural changes within the enterprise" that do not "preclude a finding that an ongoing enterprise existed," *Cottone*, 928 F.2d at *2, even though "the faces in the group may have changed," *Tillett*, 763 F.2d at 631.  These minor variations do not transform this scheme into one that falls short of an enterprise, such as where there are four separate schemes with different participants and in which a single individual was "the only member common to all four ventures."  *United States v. Pinson*, 860 F.3d 152, 162 (4th Cir. 2017).  Indeed, far from the situation in *Pinson*, here the same core group (Nelson, Kirschner, and Atherton) participated in, and shared the profits of, *every* transaction, which all followed a similar pattern with overlapping players and victims.

43

*Longevity*: Defendants' scheme had sufficient continuity to constitute an enterprise. The scheme began, at the very latest, in September 2017 when Kirschner invited Watson to submit his first bid for an Amazon lease, JA3658-3659, and continued into early 2020, when the last transactions closed, JA6584-6596. This span of time was more than sufficient to allow Defendants to pursue their common purpose as a continuing unit and to pose a threat of ongoing fraud. *See, e.g.*, *United States v. Stodola*, 953 F.2d 266, 270 (7th Cir. 1992) (20-month scheme sufficient).

Without Amazon's discovery of the scheme, moreover, it would have continued. "Amazon would have suffered total potential economic harm of at least $21,554,346 over the life of the Lease Transactions and Purchase Transactions." JA2467. As Nelson told Ramstetter, "of course we're gonna do … future development deals." JA2882. Amazon's discovery of the fraud thwarted these efforts, but that does not defeat the enterprise's longevity—"the lack of a threat of continuity of racketeering activity cannot be asserted merely by showing a fortuitous interruption of that activity." *CVLR Performance Horses, Inc. v. Wynne*, 524 F. App'x 924, 929 (4th Cir. 2013) (quotation marks omitted).

Eleven multi-million dollar transactions involving the same core participants over two-plus years more than suffices. *See ePlus Tech.*, 313 F.3d at 183 (commercial fraud amounting to $10 million adequate for racketeering liability given two prior similar frauds by the core players); *Liquid Air Corp. v. Rogers*, 834 F.2d 1297,

44

1305 (7th Cir. 1987) ("repeated infliction of economic injury upon a single victim of a single [commercial bribery] scheme is sufficient to establish a pattern of racketeering activity for purposes of civil RICO"); *Uniroyal Goodrich Tire Co. v. Mut. Trading Corp.*, 63 F.3d 516, 519 (7th Cir. 1995) (similar); *Cap. Lighting & Supply, LLC v. Wirtz*, 2018 WL 3970469, at *12 (D. Md. Aug. 20, 2018) (commercial bribery enterprise).

Given these facts, even the district court's incorrectly applied conspiracy theory would not defeat the enterprise element here. A "rimless wheel conspiracy" is "one in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction." *Dickinson*, 309 F.3d at 203. Thus, the conspiracy claim failed in *Dickson* because one defendant—Microsoft—had entered into a series of separate agreements with different manufacturers and plaintiff made no argument that "it is able to meet the test for establishing a 'rim.'" *Id.* at 203. Similarly, in *Donaldson v. Primary Residential Mortgage, Inc.*, one defendant formed separate agreements with different lenders and the "Complaint [wa]s bereft of allegations suggesting that the … lenders were working together … or … were even aware of each other's existence." 2020 WL 3184089, at *26 (D.

45

Md. June 12, 2020).[10] Here, Nelson, Kirschner, and Atherton took part in *every* fraud and interacted largely with the same overlapping group in each transaction. This was no rimless wheel.

### B.    One need not be an enterprise member to be liable under RICO

RICO liability extends to those "associated with" an enterprise or who "conspire" to violate a RICO provision, 18 U.S.C. § 1962(c), (d), with "no requirement of some overt act or specific act," *Salinas*, 522 U.S. at 62-63 (quotation marks omitted). A RICO conspiracy may "exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense"—liability applies if the conspirator "agree[s] to pursue the same criminal objective." *United States v. Cornell*, 780 F.3d 616, 624 (4th Cir. 2015) (quotation marks omitted).

A defendant can be liable as a RICO conspirator without becoming an enterprise member. "Outsiders who help the enterprise accomplish its illicit goals … are fully liable under § 1962(d)." *Cornell*, 780 F.3d at 631. It is enough that the defendant "participated in the conspiracy with knowledge of the essential nature of the plan." *Tillett*, 763 F.2d at 632; *see also United States v. Christensen*, 828 F.3d 763, 780 (9th Cir. 2015) (liability where defendant "know[s] the general nature of the enterprise and … that the enterprise extends beyond his individual role." (quotation

---

[10] *Donaldson* also conflicts with other courts in this circuit. *See McDonald v. Robinson*, 2020 WL 10456846, at *14 (E.D. Va. Sept. 4, 2020) (enterprise exists when one member "worked as the liaison" between others).

marks omitted)). Thus, even if one participated in too few actions or was too tangentially involved to be an enterprise member, he would still be liable as conspirator. *See Salinas*, 522 U.S. at 65 ("may [be] somewhat difficult to determine just where the enterprise ends and the conspiracy begins"). By concluding that no enterprise existed absent a direct connection between *all* Defendants, JA3729, the district court legally erred by ignoring the possibility that a core group (*i.e.*, Nelson, Kirschner, and Atherton) formed a RICO enterprise with the remaining Defendants participating at times as conspirators in violation of Section 1962(d) or as those associated with the enterprise under Section 1962(c).

## III. Amazon's Equitable Claims Were Erroneously Dismissed

The summary-judgment record amply supports Amazon's claims for unjust enrichment and conversion. Rather than dispute Amazon's ability to prove either theory of liability, the district court held that these equitable claims could not go forward because Amazon "has an adequate remedy at law." JA3745-3746 (referencing a "damages claim" for conversion and "disputed contracts," *i.e.*, the lease agreements, for the unjust-enrichment claim).

These conclusions are wrong several times over.

### A. The court's ruling was premature

Even assuming some *possibility* that Amazon's remedies at law might ultimately prove sufficient to preclude equitable relief, that determination cannot be made until the case has proceeded through trial.

The potential availability of an adequate legal *remedy* does not, as the district court ruled, defeat the pre-trial viability of Amazon's equitable *claims*. *See* JA3746. This Court already held that even though "money damages are claimed along with equitable relief," that "does not defeat the district court's equitable powers." *Amazon.com*, 2021 WL 3878403, at *4 (citation omitted); *id.* at *6 ("a plaintiff is permitted to plead equitable theories of relief such as unjust enrichment and quantum meruit as alternatives to contract recovery" (citation omitted)).

A "commercial bribery" victim-plaintiff has a *choice* of remedies: it "can obtain … either the damages that he has sustained (the damages remedy) or the profits that the bribe yielded (the restitution or unjust enrichment remedy)." *Garrity*, 366 F.3d at 576 (citing 2 Dobbs, Law of Remedies § 10.6 (2d ed. 1993)). The plaintiff, "[o]f course," cannot "*keep* both damages and profits," but it can *pursue* both and keep "the larger of the two." *Id.* at 578 (emphasis added). Because the plaintiff will not know which is the larger until after trial, it can "seek (legal) damages from a jury and then, if it thought it could obtain a larger recovery by way of restitution, an order of restitution from the judge." *Id.* at 578.

This Court's precedents are in accord. In *Homeland Training Center, LLC v. Summit Point Automotive Research Center*, this Court reaffirmed that, because the "basic purpose" of the "common law doctrine of election of remedies" "is to prevent

a plaintiff from obtaining" "overlapping remedies for the same legal injury," a plain-tiff need not make "a conclusive election" until "a suit has advanced to *judgment*." 594 F.3d 285, 292-93 (4th Cir. 2010) (emphasis added); *see also United Roasters, Inc. v. Colgate-Palmolive Co.*, 649 F.2d 985, 990 (4th Cir. 1981) (election of reme-dies occurs after a verdict is entered); 25 Am. Jur. 2d Election of Remedies § 13 (same) (collecting cases). The district court therefore erred in foreclosing equitable relief pre-trial.

### B. Amazon is entitled to equitable remedies because Defendants' un-lawful gains exceed Amazon's direct damages

The district court's rejection of Amazon's equitable claims is also fatally flawed in a second respect. Any bar to equitable relief is triggered only when the plaintiff's damages *exceed* the defendants' illicit profits. *See* 27A Am. Jur. 2d Eq-uity § 81 ("a litigant may resort to an equitable remedy where monetary damages … would be inadequate"); *Bolling v. King Coal Theatres*, 41 S.E.2d 59, 62 (Va. 1947) (legal remedy must be "plain, adequate and *complete*" (emphasis added)).

The summary judgment record shows that Defendants' unjust gains *exceed* Amazon's request for direct damages. "Amazon suffered actual economic harm"

totaling $17,330,360, but the "[u]njust enrichment obtained by the Defendants" totals $33,580,613. JA2432-2442.[11] Moreover, Defendants have consistently argued that Amazon lacks *any* damages at all. *See* Dkt. 1174 at 1; Dkt. 1176 at 19; Dkt. 1169 at 3-4; Dkt. 1173 at 12. This Court has already held that because defendants "contest[] [their] liability" for damages, "Amazon cannot be barred from arguing unjust enrichment in the alternative." *Amazon.com*, 2021 WL 3878403, at *6; *see also* Restatement (First) Restitution § 1 *cmt. e* (1937) (unjust enrichment available where "plaintiff has not suffered a corresponding loss or … any loss"). The district court erred in disregarding that holding.

Lastly, as this Court recognized in *Amazon.com*, a damages "remedy" would be inadequate if Amazon cannot collect damages from the defendants due to their insolvency. *See* 2021 WL 3878403, at *8. A constructive trust, giving Amazon priority over unsecured creditors, provides relief unavailable at law. *See Jones v. Harrison*, 458 S.E.2d 766, 769 (Va. 1995); *Faulknier v. Shafer*, 563 S.E.2d 755, 758-59 (Va. 2002). This is particularly relevant given the Watson Defendants' "conceded 'likelihood of insolvency'" at the conclusion of this litigation. *Amazon.com*, 2021 WL 3878403, at *8.

---

[11] Defendants' unjust enrichment exceeds Amazon's direct economic harm because, among other reasons, Northstar received inflated lease transaction fees that were paid upfront by its business partner or lenders. JA2431-2433, JA7238.

**C.    Neither the original lease agreements nor the amended leases preclude Amazon's unjust enrichment claim**

The district court was also wrong to conclude that the lease agreements "preclude[] Amazon's unjust enrichment claim." JA3746. No contract bars Amazon's equitable claims. Moreover, the district court's ruling violates this Court's mandate from the prior appeal.

*1. No contract bars Amazon's equitable claims*

The original leases do not bar Amazon's equitable claims. *Contra* JA3746. True, relief may be barred where "an express contract cover[s] the same subject matter" as the "claim for unjust enrichment." *James G. Davis Constr. Corp. v. FTJ, Inc.*, 841 S.E.2d 642, 647 (Va. 2020) (quotation marks omitted). But it is "'plainly erroneous'" to assert that "'there can be no unjust enrichment in contract cases.'" *Id.* at 648 (quoting Restatement (Third) of Restitution and Unjust Enrichment § 2, *cmt. c* (2011)). "Amazon's unjust enrichment claims are not confined to the contracts" but instead "take aim at Northstar's broader scheme to acquire Amazon's business and thereby generate illicit profits," so the contracts do not bar equitable claims. *Amazon.com*, 2021 WL 3878403, at *5; *see also id.* (expressly rejecting argument that Amazon could not pursue "equitable relief because it is based on express contract[s] covering the same subject matter") (quotation marks omitted).

The district court precluded the unjust enrichment claim after concluding Amazon "affirmed the leases at issue." JA3746. But contract affirmation precludes an

unjust enrichment claim only if the affirmed "contract exists between the parties" and "cover[s] the same subject matter of the parties' dispute." *CGI Fed. Inc. v. FCi Fed., Inc.*, 814 S.E.2d 183, 190-91 (Va. 2018). This question "is one of law," *id.* at 190, and is readily resolved against Defendants, because Amazon did not "affirm" any contracts with them.

In December 2021, Amazon executed amended lease agreements, "re-plac[ing]" Northstar's role controlling the landlord entities with IPI. *See* JA1340. The amended agreements did not ratify any of the kickback-tainted terms, but instead adopted new terms that purged kickback-inflated terms that had illegally inflated Amazon's rent. *See* JA1340-1341. Moreover, Defendants are not parties to the amended leases, so any potential contract claim cannot be "adequate" where, as here, Defendants are not "amenab[le] to suit under th[ose] contracts." *Amazon.com*, 2021 WL 3878403, at *6 (collecting cases); *see also CGI Fed. Inc.*, 814 S.E.2d at 190 (the contract must "exist[] between the parties"). In short, because Amazon removed the fraudulent terms, did not "consent to be bound by" them, and did not enter into new contracts with any Defendants, Amazon did not "affirm" any contract that "exists between the parties" and "cover[s]" this dispute. *CGI Fed. Inc.*, 814 S.E.2d at 190-91 (quotation marks omitted).

Furthermore, the district court's "affirmation" rationale is independently flawed for ignoring White Peaks and Blueridge. The court granted summary judgment for Defendants on the unjust enrichment claim in its entirety, but there is no alleged "affirmation" with respect to those fraudulent purchase transactions. The judgment should be reversed for this reason as well.

*2. The district court violated this Court's mandate*

This Court previously held that "Amazon cannot be barred from arguing unjust enrichment" notwithstanding its parallel legal claims for damages. *Amazon.com*, 2021 WL 3878403, at *6. "Absent exceptional circumstances, the mandate rule 'compels compliance … with the[se] dictates' "and forecloses relitigation of [these] issues" that were "expressly or impliedly decided by [this Court].'" *Volvo Trademark Holding Aktiebolaget v. Clark Mach. Co.*, 510 F.3d 474, 481 (4th Cir. 2007) (citation omitted).

The district court sought to avoid the mandate by asserting that the "facts have changed significantly" since this Court decided *Amazon.com*—specifically, in "February 2022," Amazon "entered into the Lease Continuity Agreement, thereby affirming the lease contracts." JA3747. But the "Lease Continuity Agreement" the district court cites, JA3747 (citing Dkt. 1174 ¶ 43), was executed on February 19, ***2020***. Dkt. 1171-24; *accord* JA3715 (entered "February 19, 2020").

The existence of the Lease Continuity Agreement was thus part of the record before this Court in the first appeal, and Watson raised the same "affirmation" argument then. *See Amazon.com*, CA4 Dkt. 18 at 19 (arguing that 2020 Lease Continuity Agreement "affirm[ed] [Amazon's] leases with the joint ventures" and thus barred Amazon from seeking equitable relief). This Court nonetheless affirmed Amazon's entitlement to pursue unjust enrichment. The district court thus had no justification for disregarding the mandate rule.

The district court also asserted that this Court "held only that it was appropriate" to plead alternative requests for relief "at an early stage of the litigation." JA3746. But this Court's ruling was broader: "Amazon cannot be barred from arguing unjust enrichment in the alternative" to its contractual claims. *Amazon.com*, 2021 WL 3878403, at *6. Any election (or assessment of the adequacy of legal relief) therefore must be made *after* trial—not at summary judgment.

## IV.    Atherton Is Not Immune From Conspiracy Liability

The district court erred in shielding Atherton from conspiracy liability on the ground that "an agent cannot be held liable for conspiring with its principal as a matter of law." JA3742.

The rule the district court applied springs from the well-established premise that "a single entity cannot conspire with itself." *Fox v. Deese*, 362 S.E.2d 699, 708 (Va. 1987). Because "a principal and an agent are not separate persons for purposes

USCA4 Appeal: 23-1991    Doc: 84    Filed: 10/16/2024    Pg: 67 of 72


of the conspiracy statute," it follows that a conspiracy solely between a principal and an agent is a "legal impossibility." *Charles E. Brauer Co. v. NationsBank of Va., N.A.*, 466 S.E.2d 382, 387 (Va. 1996).

The district court failed to recognize, however, that "the general rule … is inapplicable" where "third parties were involved" in the conspiracy. *Treads USA, LLC v. Boyd LP I*, 2010 WL 2711266, at *11 (W.D. Va. May 4, 2010), *report and recommendation adopted as modified,* 2010 WL 2695665 (W.D. Va. July 7, 2010) (applying Virginia law); *see also Bowman v. State Bank of Keysville*, 331 S.E.2d 797, 801 (Va. 1985) ("a third party is necessary to create an actionable conspiracy"). If an outsider to the principal-agent relationship is involved in the conspiracy, the single-entity rule falls away. *Blackburn v. A.C. Israel Enters.*, 2023 WL 4710884, at *32 (E.D. Va. July 24, 2023) (defense irrelevant because conspiracy "reaches far beyond [parent] and its affiliated entities").

The two Virginia cases cited by the district court confirm this basic point.  In *Fox*, the conspiracy involved *only* a principal (the City of Richmond) and its agents (officials of the City).  362 S.E.2d 699, 708 (Va. 1987).  Likewise, in *Perk v. Vector Resources Group, Ltd.*, "a principal-agent or an employer-employee relationship existed between" *all* defendants.  485 S.E.2d 140, 144 (Va. 1997).  The other leading Virginia Supreme Court case to apply the doctrine, *Charles E. Brauer Co.*, similarly

involved agreement solely between a bank and its agent, meaning only "[o]ne entity existed" for the purposes of conspiracy law—"the bank."  466 S.E.2d at 387.

Not so here.  Atherton conceded he did not have an attorney-client relationship with Nelson or Kirschner when he set up the Villanova Trust to launder the kickbacks.  JA1752, JA1763 (only representing Christian).  The summary-judgment record is replete with additional evidence sufficient, at least, to create a genuine dispute as to whether additional non-clients—including Watson, Northstar, and Ramstetter—were co-conspirators.  The district court acknowledged as much in sustaining Amazon's tortious-interference claim and the associated conspiracy claim as to other Defendants.  JA3742.

The conspiracy claim against Atherton is viable for a separate reason:  his principal-agent defense does not apply where an agent acts outside the scope of his principal-agency relationship.  *Fox*, 362 S.E.2d at 708.  Thus, Atherton can be liable for conspiring with purported clients "[t]o the extent that [he] acted without reference to an attorney-client relationship."  *PJS Assocs., L.P. v. Cosby*, 2000 WL 1618100, at *4 (Va. Cir. Ct. Oct. 26, 2000).  A lawyer who "assist[s] a client[] in conduct that the lawyer knows is criminal or fraudulent" is no longer acting within the "[s]cope of [his] [r]epresentation" as an attorney, Model Rules of Prof'l Conduct r. 1.2(d) (Am. Bar Ass'n 2023), but rather has "crossed the line and bec[ome] 'part

56

of'" the unlawful scheme, *United States v. Farrell*, 921 F.3d 116, 139 (4th Cir. 2019).

There is, at least, a genuine dispute whether Atherton was merely acting properly as an attorney or, as Amazon contends, was "'up to his eyeballs' in the fraudulent scheme." *United States v. Bush*, 626 F.3d 527, 539 (9th Cir. 2010). This question of fact requires "an evidentiary hearing," *see Fox*, 362 S.E.2d at 708; *Compassionate Care Pediatrics, LLC v. Child.'s Med. Ctr., Ltd.*, 100 Va. Cir. 6 (2018) (scope of employment is fact issue), and should have been left for the jury.

The district court also wrongly concluded that Amazon failed to respond to the argument that Atherton's status as Nelson's and Kirschner's attorney shielded him from conspiracy liability. JA3742. This issue was both pressed and passed upon. *Pratt*, 915 F.3d at 271 n.4. Amazon argued that "Atherton was a coconspirator and was paid handsomely for it." JA650-652, JA667. It directly addressed Atherton's argument—that his status as Nelson's and Kirschner's lawyer absolved him of conspiracy liability—by arguing that "a lawyer representing or advising such an entity can readily turn himself into a coconspirator—or aider or abettor—in the form of a consigliere or fixer." JA667 (quoting *Farrell*, 921 F.3d at 138). And it argued that Atherton was not acting in an attorney-client capacity, but was instead an active participant in the fraud. JA645, JA651-652. In addition, because the district court passed on this argument, JA3742, it was "plainly encompassed by the

57

submissions made below" and is not forfeited. *Hayes v. Delbert Servs. Corp.*, 811

F.3d 666, 675 n.2 (4th Cir. 2016) (quotation marks omitted).

## CONCLUSION

The Court should reverse and allow the dismissed claims to proceed to trial.

Dated:  October 16, 2024                  Respectfully Submitted,

*s/ Thomas G. Hungar*
Thomas G. Hungar
  *Counsel of Record*
Patrick F. Stokes
David Debold
Claudia M. Barrett
David W. Casazza
Amanda Sterling
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500

*Counsel to Plaintiffs-Appellants*
*Amazon.com, Inc. & Amazon Data*
*Services, Inc.*

## REQUEST FOR ORAL ARGUMENT

This appeal involves important questions of law and an extensive factual record.  Oral argument would assist the panel's resolution of the appeal.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

This brief complies with the type-volume limits set forth in Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this brief contains 12,946 words. This brief complies with the typeface and style requirements because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.

                                            *s/ Thomas G. Hungar*

                                            Thomas G. Hungar
GIBSON, DUNN, & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
(202) 955-8500

*Counsel to Plaintiffs-Appellants Amazon.com, Inc. & Amazon Data Services, Inc.*